**James KARR and Nancy L. Karr, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 90–8000.**

United States Court of Appeals, Eleventh Circuit.

Feb. 27, 1991.

---

Dennis N. Brager, Jackson D. Hamilton, Spensley, Horn, Jubas & Lubitz, Los Angeles, Cal., for petitioners.

Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, Chief, Appellate Section, Kenneth W. Rosenberg, Mary Frances Clark and David I. Pincus, Tax Div., Dept. of Justice, Washington, D.C., for respondent.

Before JOHNSON and HATCHETT, Circuit Judges, and DYER, Senior Circuit Judge.

HATCHETT, Circuit Judge:

In this tax case, we affirm the Tax Court holding that the transactions in question constituted sham transactions, subjecting the taxpayers to deficiencies, additions to taxes, and interest.

## FACTS

Richard Basile was a promoter of energy-related limited partnerships. In 1981, he discussed a possible K–Fuel project with a Swiss investor, with whom Basile had an ongoing relationship. K–Fuel is a dry, stable, high heating value solid fuel, physically resembling coal, which is produced by placing wood, peat, lignite and other low-grade biomass or fossil fuel into a Koppelman reactor, where it is dried and carbonized at high temperatures and pressure (the Koppelman process). This technique was developed by Edward Koppelman.

As part of an intricate network of interrelated entities formed to exploit the Koppelman process, Intro–Continental Investment, B.V. (Intro–Continental) was established. Basile received a 15–percent interest in Intro–Continental and in its wholly owned subsidiary, Ronodo Corporation, N.V. (Ronodo). Basile also became Chairman, Chief Executive Officer, and President of Petro–Syn Corporation (Petro–Syn), in which he owned a 35–percent interest.

In August, 1981, Ronodo licensed from Koppelman the exclusive right (as well as other rights) to use the Koppelman process within the state of North Carolina to refine peat and wood into K–Fuel. All of these rights were sublicensed by Ronodo to its wholly owned subsidiary Sci–Teck Licensing Corporation (Sci–Teck).

Peat Oil and Gas Associates, Ltd. (POGA) and Syn–Fuel Associates, Ltd. (SFA) were also formed as part of the network, allegedly to exploit Koppelman process technology and to acquire and develop oil and gas interests. According to the nearly identical offering memoranda, each partnership offered 125 to 250 limited partnership interests. The memoranda described POGA's general partner as a certified public accountant and financial consultant and SFA's general partner as a tax and financial consultant. Neither general partner had any technical background relevant to the partnerships' proposed activities.

The memoranda estimated tax losses during the initial four years of the partnerships' operations to average 401 percent. Thus, each investor purchasing one partnership unit for a $37,500 cash investment could deduct $150,376 in tax losses over four years. In order to be eligible to purchase units in the partnership, a prospective limited partner was required to fill out an Offeree Suitability Questionnaire, representing that the person had a net worth of at least $250,000 (exclusive of home, furnishings and automobiles) and was subject to federal income tax at the highest brackets. The memoranda also clearly warned that financial success in terms of K–Fuel development was highly unlikely. Factors cited included (1) commercially unproven technology; (2) lack of experience; (3) conflict of interests; (4) large obligations incurred without arm's-length negotiations; (5) environmental and health problems; (6) severe competition; and (7) inadequate capital (after payments to the promoters and their associates).

POGA and SFA entered into a joint venture agreement to own and operate a pilot K–Fuel plant in North Carolina.[1] The partnerships licensed from Sci–Teck the exclusive right within the state of North Carolina to use the Koppelman process with respect to peat and wood as well as the nonexclusive right to use the Koppelman process in the remainder of the United States with respect to any material other than bagasse. At the end of 1981, the partnerships also entered into a research and development agreement with Fuel–Teck Research and Development (FTRD), a wholly owned subsidiary of Petro–Syn. FTRD's role was to conduct and coordinate the research and development efforts for the benefit of the partnerships, and to oversee construction of the Koppelman process plant.

POGA agreed to pay a license fee to Sci–Teck which included both cash and partnership notes of $112,175 for each partnership unit sold. Specifically, for each partnership unit sold, POGA agreed to pay $12,975 in cash between October 1, 1981, and October 1, 1984, and $99,200 in promissory notes due between October 1, 2006, and October 1, 2009. POGA also agreed to pay FTRD a fee for its services. The structure of this payment required POGA to pay FTRD, for each partnership unit sold, $5,000 in cash between October 1, 1981, and October 1, 1982, and $24,800 in promissory notes due between October 1, 2006, and October 1, 2007.

The partnerships' oil and gas investments were to partially subsidize the efforts to develop the Koppelman process. Fuel–Teck Oil and Gas, Inc. (FTOG), another wholly owned subsidiary of Petro–Syn, was to be responsible for those oil and gas activities. The revenue derived from oil and gas projects would be used to pay off POGA's notes to Sci–Teck and FTRD.

James Karr became a limited partner in POGA in December, 1981. He purchased one unit as a tenant in common with Rob-

ert Bluhm. Karr's purchase called for payment of $80,750 over a 26–year period. Karr's obligations to POGA were embodied in full recourse promissory notes. Karr timely made payments of all amounts, including interest due to POGA, between 1981 and 1984. On December 29, 1981, Karr entered into an agreement with Sci–Teck and FTRD pursuant to which he agreed to assume personal liability for POGA's obligations in the amounts of $49,-600 and $12,400.

On its income tax return for 1981, POGA deducted $4,288,375 as a license fee to be paid to Sci–Teck and $4,288,375 as a research and development fee to be paid to FTRD. The amounts represented accrual of the notes and cash payments due on 211.25 partnership units, determined as of the date the 1981 income tax return was prepared. On its 1982 income tax return, POGA deducted $5,830,500 as a license fee to be paid to Sci–Teck and $1,964,625 as a research and development fee to be paid to FTRD. For 1982, POGA also deducted $505,897 as interest expense and reported $428,455 as interest income on notes receivable.

On their joint income tax returns for 1981 and 1982, James and Nancy Karr deducted $20,191 and $19,593, respectively, as their distributive share of partnership losses. The Commissioner of Internal Revenue disallowed these deductions on the ground that the activity in which POGA was engaged was not entered into for a profit. The Commissioner also asserted that the purported liability underlying POGA's claimed $505,897 interest expense deduction was contingent and that the notes lacked economic substance. Accordingly, the Commissioner determined deficiencies in the Karrs' federal income tax of $8,907 for 1981 and of $7,972 in 1982, and assessed an addition of $797 to their 1982 tax.

## PROCEDURAL HISTORY

The Karrs petitioned the Tax Court to redetermine the tax deficiencies set forth in

---

**1.** By 1984, the Koppelman process plant had been built. Nevertheless, only a few bucketfuls of K–Fuel ever were produced at the North Carolina plant. As of 1988, it had been two

years since equipment at the plant last had been operated, and the equipment had been partially dismantled.

the notice of deficiency, and their case was selected as one of two test cases involving the POGA and SFA partnerships.[2] Following a week-long trial, the Commissioner conceded that the Karrs could deduct their distributive shares of partnership losses attributable to oil and gas investments. Consequently, the Tax Court addressed the Karrs' claimed deductions for distributive shares of losses represented by POGA's payments to Sci–Teck for license fees and to FTRD for research and development fees.

The Tax Court held that the Karrs were not entitled to the claimed deductions. *Smith v. Commissioner*, 91 T.C. 733 (1988). The Tax Court determined that tax motivations shaped the limited partnership transactions in question and that POGA's Koppelman process activity lacked economic substance apart from the anticipated tax benefits. In addition, the Tax Court determined that such activity was not within the scope of section 174 of the Internal Revenue Code.[3] The Tax Court also sustained the addition to tax under section 6661(a) for substantial understatement of income tax, and the imposition of additional interest under section 6621(c) on substantial underpayments attributable to tax motivated transactions.

## CONTENTIONS

The Karrs contend that the Tax Court erred in determining that POGA's Koppelman process activity was primarily motivated by tax benefits and lacked economic substance. The Karrs also contend that even if the primary purpose of POGA's activities was the avoidance of tax, the claimed amounts are deductible. Finally, the Karrs contend that without regard to whether the other expenses incurred in connection with the Koppelman process activity are deductible, the interest on the partnership notes is deductible.

The Commissioner contends that the Tax Court correctly ruled on all issues.

## ISSUES

The issues are: (1) whether the Tax Court correctly determined that the Karrs are not entitled to deduct their allocable share of partnership losses from the Koppelman process activity; (2) whether the Tax Court correctly determined that the Karrs are liable for additions to tax for substantial understatement of their tax liability; and (3) whether the Tax Court correctly determined that the Karrs are required to pay additional interest for tax motivated transactions on any underpayment.

## DISCUSSION

### I. Claimed Deductions

On their 1981 and 1982 income tax returns, the Karrs sought to deduct their pro rata share of partnership losses arising from POGA's payment of license fees and research and development fees. In their petition to the Tax Court, the Karrs claimed that they were entitled to these deductions pursuant to either section 162 or section 174. Section 162(a) allows deductions for "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business," and section 174(a)(1) allows deductions for "research or experimental expenditures which are paid or incurred ... in connection with [the taxpayer's] trade or business...." 26 U.S.C.A. (West Supp.1990).

### A. Sham Transaction Analysis

Before determining whether a particular activity arises in or is connected with a trade or business, it must first be established that the transaction in question is bona fide and not a sham. A sham transaction is one which, though it may be proper in form, lacks economic substance beyond

2. The other test case is now on appeal in *Dean B. Smith and Irma Smith v. Commissioner* (6th Cir. No. 90–1007).

3. Unless otherwise noted, all statutory references are to the Internal Revenue Code of 1954 (26 U.S.C.), as amended and in effect during the years in issue. The 1954 Code has since been redesignated as the Internal Revenue Code of 1986. *See* Tax Reform Act of 1986, Pub.L. No. 99–514, § 2, 100 Stat. 2085.

the creation of tax benefits. *Knetsch v. United States*, 364 U.S. 361, 365–66, 81 S.Ct. 132, 134–35, 5 L.Ed.2d 128 (1960); *Kirchman v. Commissioner*, 862 F.2d 1486, 1491 (11th Cir.1989). This determination is significant because expenses incurred in connection with a sham transaction are not deductible. *Kirchman*, 862 F.2d at 1490. Both the taxpayers' subjective intent and the objective economic effect of the transaction may be relevant to this inquiry. *See Kirchman*, 862 F.2d at 1491.

In the Eleventh Circuit, the Tax Court's finding that a transaction is a sham is normally subject to the clearly erroneous standard of review; the legal standard applied by the Tax Court in determining if a transaction is a sham is subject to plenary review. *Kirchman*, 862 F.2d at 1490.

The Tax Court framed the issue as whether POGA was "engaged in the trade or business of developing energy sources from the Koppelman process or [whether it was] in the business of financing the operations of other entities in exchange for tax benefits." [4] The activities of the other entities involved in exploiting the Koppelman process, however, cannot necessarily be attributed to POGA. *See Beck v. Commissioner*, 85 T.C. 557, 574 (1985). After receiving evidence as to the purpose and structure of the transactions, and examining the transactions in light of objective factors, the Tax Court found that the substance of the transactions was that POGA provided cash to finance the promoters' activities for their various projects, and in return, POGA's limited partners would receive tax benefits in the form of deductible losses. The Tax Court concluded that POGA's Koppelman process activity lacked economic substance.

The Karrs initially contend that the Tax Court erred as a matter of law because it applied the "generic tax shelter" test to determine whether the transaction lacked economic substance. According to the Karrs, this test was rejected in *Rose v. Commissioner*, 868 F.2d 851, 853 (6th Cir. 1989), in *Collins v. Commissioner*, 857 F.2d 1383, 1386 (9th Cir.1988), and should be rejected by this circuit. The Tax Court, however, did not merely characterize the transaction as a "generic tax shelter," and conclude that the transaction was therefore a sham. Instead, the Tax Court considered characteristics of generic tax shelters to aid in identifying transactions in which tax motivation is apparent.[5] The Tax Court correctly focused its analysis upon an examination of the substance of the transactions to determine whether those transactions had any practicable economic effect other than the creation of tax benefits.[6]

The Karrs next contend that the Tax Court's conclusions are erroneous because the Tax Court never determined that no reasonable possibility of profit existed, nor could it have done so on the evidence presented. According to the Karrs, experts testified that, viewed from the standpoint of 1981, POGA had a reasonable prospect of profitability in that the profit potential was in the range of 25 to 40 percent. The Karrs assert that this testimony was

4. The deductibility of POGA's expenditures on the Karrs' federal income tax returns is first determined at the partnership level. *See Brannen v. Commissioner*, 722 F.2d 695, 703–04 (11th Cir.1984).

5. Characteristics attributed to "generic tax shelters" in *Rose v. Commissioner*, 88 T.C. 386, 412 (1977), which the Tax Court found to be substantially present in POGA's transactions, include:

(1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in rela-

tion to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance.

6. *Cf. Rose*, 868 F.2d at 854 ("[T]he tax court's analysis is correct and consistent with the analysis traditionally applied by this circuit in determining whether a particular transaction is a sham"); *Collins*, 857 F.2d at 1386 ("Although the generic tax shelter test is not incorrect, it does not aid courts in that basic inquiry [of looking beyond a transaction's form to uncover its substance]").

unimpeached, competent, and uncontradicted. Nevertheless, the Karrs' reliance on the experts' testimony is unwarranted given the basis of that testimony. The experts assumed that the Koppelman process plant would be commercially successful, and failed to consider the various risk factors discussed in POGA's offering memorandum.

■ Although the Commissioner presented no expert witnesses, the record contains substantial evidence from which one may conclude that POGA's Koppelman process activity lacked economic substance and had no business purpose other than the creation of tax benefits. The offering memorandum emphasized the tax benefits of the partnership, including anticipated tax write-offs for the limited partners of four times their cash investment over the first four years of the partnership. The purchasers of partnership units did not negotiate for the price of their shares and knew of conflicting business interests.[7] POGA held no tangible assets, and the limited rights to exploit the Koppelman process that POGA did possess were difficult to value. Moreover, the fees paid by POGA to Sci–Teck and FTRD were not the result of arm's-length negotiations.

■ The amount and structure of the fees paid by the partnerships also lend support to the Tax Court's conclusion that the transactions lacked economic substance. POGA and SFA incurred a fixed obligation to pay an amount potentially 56 to 112 times greater than the price paid by Ronodo; yet, the partnerships received fewer rights than did Ronodo to exploit the Koppelman process. Another noteworthy difference between Ronodo's payments to Koppelman and POGA's payments to Ronodo is that Ronodo's payments were contingent on the completion and testing of the system's construction and on the commercial success of the Koppelman process technology and exploitation. In contrast, POGA's payments to Sci–Teck and FTRD were based on a multiple of the number of partnership units sold. Furthermore, the bulk of POGA's payment consisted of promissory notes due in twenty-five years. Although they were recourse notes, the Tax Court found that the substantive liability that they represented was significantly less than the face amount of the notes.

The Tax Court also relied on the testimony of Michael Zukerman, a partner in the law firm of Baskin & Sears. Basile, who was previously a client of Baskin & Sears, brought the firm into the project as legal counsel. Baskin & Sears prepared all the promissory notes, contracts, and assumption agreements entered into by POGA, SFA, and their limited partners. Intro–Continental and Basile paid the law firm for these services. Zukerman was the Baskin & Sears partner responsible for the project. In that capacity, Zukerman reviewed POGA's offering memorandum and attended many of the meetings involved in the project's formation.

■ The Karrs contend that Zukerman's testimony is irrelevant to a determination of the business purpose for the partnership. According to the Karrs, Zukerman only acted as a legal advisor to the promoters and the partnerships. He was not in control of the partnerships, and was not involved in making the business decisions which led to the formation of the partnerships. The Tax Court, however, used the testimony in its determination of whether the transactions lacked economic substance; the focus was not solely on the taxpayers' subjective motivations.

On direct examination, the taxpayers' counsel asked Zukerman if he had been involved with the structuring of the transaction. He responded, "Yes." Upon further direct examination, Zukerman made

---

7. For example, Basile's personal interests conflicted with the interests of POGA and SFA. Basile was President and Chief Executive Officer of Genoco Industries, Inc. (Genoco), and a promoter of Petrogene Oil and Gas Associates (Petrogene). The partnership memorandum warned that Genoco would engage in oil and gas activities similar to those engaged in by FTOG, and that Genoco planned to convert bagasse into synthetic fuel. Basile had a proprietary interest in Petro–Syn, Sci–Teck, Ronodo, Genoco, and Petrogene, all entities which stood to profit at the expense of the partnerships.

statements quoted at length by the Tax Court concerning the reasons that the particular structure was chosen for the transactions. At trial, the Karrs did not suggest that Zukerman was misrepresenting anyone's intentions. Moreover, it was stipulated that the general partners of POGA and SFA relied upon others' advice, including Zukerman and his associate, "both in the operation of the partnership and the initial decision to form the partnership." Although the general partners did not testify, Zukerman testified that the transactions, and POGA's role in the transactions, "had to do with the tax structure, in order to accomplish the desired tax results, you have to have an independent license from a contract, and the partnership, ... and the structure was really a tax structure to accomplish the desired tax end."

After careful examination of the record, we conclude that the Tax Court properly analyzed whether the Koppelman process activity involving POGA lacked economic substance, and properly found that those transactions did lack economic substance. Consequently, the expenses arising from those sham transactions are nondeductible.[8]

### B. Interest Analysis

■ The Karrs contend that regardless of whether the other expenses incurred in connection with the Koppelman process activity are deductible, interest on the partnership notes is deductible if the obligation is genuine. *See Rice's Toyota World v. Commissioner*, 752 F.2d 89, 96 (4th Cir. 1985). The Karrs had agreed to assume POGA's notes to Sci–Teck and FTRD due in twenty-five years only as to the principal, not the interest. According to the Karrs, the Tax Court found that the projected revenues from gas and oil well

drilling would have been sufficient to completely retire POGA's promissory notes to Sci–Teck and FTRD as to both principal and interest. The Karrs' oil and gas expert testified that the projection set forth by the partnerships was reasonable. The Karrs contend that the Tax Court clearly erred in not finding that the interest on the notes would be paid by POGA without regard to the success of its Koppelman process activity.

Using an accrual method of accounting, an expense is deductible only in the tax year in which all events have occurred which determine the fact of the liability and the amount thereof. Treas. Reg. § 1.461–1(a)(2). Because the interest on the notes was payable only out of POGA's anticipated revenues, and payment was not due for twenty-five years, the Tax Court did not clearly err in finding that the obligation to pay was too contingent to meet the standards for accruability.

### II. Addition to Tax for Substantial Understatement of Tax Liability.

■ Section 6661(a) provided that "[i]f there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement." 26 U.S.C.A. (West 1989).[9] A substantial understatement of income tax is one which exceeds the greater of 10 percent of the tax required to be shown on the return for the year or $5,000. 26 U.S.C. § 6661(b)(1). If the understatement is due to an arrangement whose principal purpose is the avoidance of federal income tax, the amount of underpayment is subject to reduction only if substantial authority exists for the taxpayer's position and the taxpayer reasonably believed that his tax treatment of the

---

8. Because we affirm the Tax Court's holding that POGA's Koppelman process activity is a sham, we need not determine whether the losses sustained from that activity are otherwise deductible under the Internal Revenue Code.

9. The Karrs' notice of deficiency was mailed previous to the 1986 amendment to section 6661(a) which increased the addition to tax from 10 percent to 25 percent. Pub.L. 99–509,

§ 8002(a). The Commissioner only imposed, and now only seeks, a 10 percent addition to the Karrs' tax liability.

Section 6661 was repealed by Pub.L. 101–239, 103 Stat. 2399 (1989). The imposition of an addition to tax for substantial understatement of tax liability is now authorized by section 6662.

item was "more likely than not the proper treatment." 26 U.S.C.A. § 6661(b)(2)(C)(i) (West 1989). The section also provided that the Commissioner may waive the addition to tax if the taxpayer demonstrates reasonable cause for the understatement and that the taxpayer acted in good faith. 26 U.S.C. § 6661(c).

On appeal, the Karrs contend that even if POGA's Koppelman process activity lacked economic substance or had as its principal purpose the generation of tax benefits, they were entitled to a waiver of the substantial understatement penalty and the Commissioner abused his discretion in failing to grant such a waiver. The Karrs contend that the transactions entered into by POGA, and the tax provisions governing those transactions, were complex. The Karrs assert that in preparing their tax returns, they reasonably relied on their accountants and on a letter they received from a national CPA firm assuring them that the deductions shown on SFA's K–1 form were correct.

The review of the Commissioner's decision to not waive the addition to tax penalty is limited to whether the Commissioner's discretion has been exercised arbitrarily, capriciously, or without sound basis in fact. *Mailman v. Commissioner,* 91 T.C. 1079, 1084 (1988). In this instance, the Karrs have not shown that the Commissioner's position was maintained for any improper purpose. The offering memorandum set forth detailed possible challenges to POGA's tax claims in the event of an audit. Moreover, the letter from the CPA firm explicitly informed the Karrs that the addition to tax for substantial understatement could be imposed against them. The Tax Court correctly concluded that the Commissioner did not abuse his discretion in this matter.

III. Additional Interest for Tax Motivated Transactions.

 Section 6621(c)(1) imposed at the relevant times additional interest on substantial underpayments of tax attributable to tax motivated transactions.[10] For the pur-

poses of this subsection, sham transactions are included in the meaning of a tax motivated transaction. 26 U.S.C. § 6621(c)(3)(A)(v). Because we affirm the Tax Court's finding that POGA's Koppelman process activity lacked economic substance, the Tax Court correctly determined that the Karrs' tax liability is subject to the imposition of additional interest pursuant to section 6621(c).

### CONCLUSION

For the reasons stated above, the Tax Court's decision is affirmed.

AFFIRMED.

---

**10.** Congress has subsequently repealed section 6621(c). Pub.L. 101–239, § 7721(b), 103 Stat. 2399 (1989).