PEAT OIL AND GAS ASSOCIATES, JAMES KARR, A PARTNER OTHER THAN THE TAX MATTERS PARTNER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Peat Oil & Gas Assocs. v. Commissioner
Docket Nos. 30296-87, 20081-88, 20130-88, 820-91, 24514-91, 30440-91
United States Tax Court
T.C. Memo 1993-130; 1993 Tax Ct. Memo LEXIS 130; 65 T.C.M. (CCH) 2259; March 31, 1993, Filed *130 For petitioners: Dennis N. Brager and Jackson D. Hamilton. For respondent: Debra K. Estrem. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: In these consolidated cases, respondent sent Notices of Final Partnership Administrative Adjustments (FPAA) disallowing certain deductions claimed on partnership returns, and petitions were filed, as follows: Docket
Date FPAA
Date Petition
Number
Partnership
Year
Sent
Filed
30296-87
Peat Oil and
1983
4-14-87
9-8-87
Gas Associates
(POGA)
20081-88
Syn-Fuel
1982
3-11-88
8-2-88
Associates
1983
1982 (SFA-1982)
1984
1985
20130-88
POGA
1984
4-4-88
8-3-88
820-91
POGA
1986
8-13-90
1-14-91
24514-91
Syn-Fuel
1983
6-17-91
10-25-91
Associates
1984
(SFA)
1985
1986
1987
30440-91
POGA
1987
8-5-91
12-27-91
In all of the petitions except those filed at docket Nos. 24514-91 and 30440-91, the principal place of business of the partnership was alleged to be in Plainview, New York. In the last two petitions filed, the principal place of business of the partnership was alleged to be in Ohio. In January and February 1992, the petitions in the earlier docketed cases were *131 amended to allege that the principal place of business of the affected partnerships was in Ohio. Our determination here will also directly affect at least 176 other cases docketed in this Court. The issue presented by stipulation of the parties is whether, for purposes of section 7482(b)(1)(E), the principal place of business of the partnerships at the time the petitions were filed was in Ohio, so that our decisions in these cases are appealable to the Court of Appeals for the Sixth Circuit. If so, petitioners are entitled to application of the favorable opinion of the Sixth Circuit in Smith v. Commissioner, 937 F.2d 1089 (6th Cir. 1991), revg. 91 T.C. 733 (1988). If the principal place of business of the partnerships (the venue for appeal) is not in the Sixth Circuit, we must decide whether we adhere to our holding in Smith v. Commissioner, 91 T.C. 733 (1988) (Smith and Karr), affd. sub nom. Karr v. Commissioner, 924 F.2d 1018 (11th Cir. 1991) (Karr), and revd. by the Sixth Circuit in Smith v. Commissioner, supra (Smith). The latter decision *132 is reflected in a separate opinion filed this date. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue and when the petitions were filed, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. The stipulation also incorporates the entire record in the cases of Smith and Karr, which were commenced in 1986 and 1987 and decided by our opinion at 91 T.C. 733 (1988). We incorporate and rely on the findings of fact set forth in our opinion in Smith and Karr. To the extent that they are relevant to the issue here, however, we summarize and supplement those findings as set forth below. General Background
James Karr (Karr) was a limited partner in Peat Oil and Gas Associates (POGA), and the Smiths were limited partners in Syn-Fuel Associates (SFA). POGA, SFA, and SFA-1982 were among many entities formed to exploit the Koppelman Process, which refines wood, peat, lignite, and other low-grade biomass or fossil fuel into a dry, *133 stable, higher-heating-value solid fuel, physically resembling coal and known in the oil and gas industry as K-Fuel. On December 31, 1981, POGA and SFA entered into a joint venture to own, operate, and manage a pilot K-Fuel plant. The plant was to be in North Carolina. POGA and SFA also entered into agreements with Chronometer Management & Consultants, Inc. (Chronometer), pursuant to which Chronometer was to render administrative services to the partnerships. Keith R. Gaskell (Gaskell) was one of the three principals of Chronometer. Gaskell was also Chronometer's president and sole employee. Chronometer and Gaskell maintained their offices in Plainview, New York, or in New York City at all material times. Management Activities
The Certificates of Limited Partnership were filed in Connecticut. The Certificate of Limited Partnership for SFA was dated August 27, 1981. The Certificate of Limited Partnership for POGA was filed September 18, 1981. The Certificate of Limited Partnership for SFA-1982 was filed April 5, 1982. The Certificates of Limited Partnership specify that the address of "the office of the Partnership" and the address of "the agent for service of process" *134 is 2777 Summer Street, Stamford, Connecticut 06905; in addition, the addresses specified for the general partner and the initial limited partner are in New York. Amended Certificates of Limited Partnership were filed at later times, but none of them indicates that the office of the agent for service of process was changed. Further, there was no indication that the office of the partnership had changed from Stamford, Connecticut, nor that the addresses for the general partner and the initial limited partner had changed from New York. The Private Placement Memorandum for each of the three partnerships states that the partnership's "principal executive office is located at 950 Third Avenue, New York, New York 10022". The Agreement of Limited Partnership for each of the three partnerships specifically designates the "principal office and place of business" as follows: 1.03 Principal Office and Place of Business. The principal office and place of business of the Partnership shall be c/o Copelon, Schiff & Zangari, P.C., 2777 Summer Street, Stamford, Connecticut 06905, or at such other location as may hereafter be determined by the General Partner. The General Partner shall *135 promptly notify the Limited Partners of any change in the principal office or place of business, or of the establishment of additional offices.
POGA and SFA issued substantially identical offering memoranda. According to the memoranda, POGA and SFA each offered 125 to 250 limited partnership interests. The memoranda stated that the partnerships were organized for the following purposes: To devote a significant portion of initial cash proceeds to a program of developmental oil and gas drilling. To reinvest a major portion of the early cash flow from initial drilling operations in order to maximize the number of partnership wells. To exploit new technology by the construction and development of an experimental pilot plan (partially funded by the Department of Energy) to convert peat, wood, and other cellulosic materials into a new and theoretically clean and efficient synthetic fuel.
The POGA memoranda identified Arthur Goldman (Goldman) as POGA's general partner and described him as follows: Arthur Goldman. Mr. Goldman is a certified public accountant licensed in the State of New Jersey. Mr. Goldman has been a financial consultant since March 1980 to World *136 Video Corporation, which is engaged in the business of producing video tapes for the medical field. He also is General Partner of Ophthalmology Associates, a limited partnership which manufactures and distributes video cassettes and disks for use by the medical profession. From 1975 to 1980, Mr. Goldman was General Manager and Treasurer of Princeton Electronic Products Inc., which manufactures medical components. During 1974 Mr. Goldman acted as financial consultant to corporations in the telecommunications industry. Prior to 1974 Mr. Goldman was, among other things, General Manager of Plessey Communication Systems Corp., which manufactured and distributed telephone equipment, and Assistant Controller of Majestic Specialties, Inc., a manufacturer of women's clothing.
The SFA memorandum identified Martin Kaye (Kaye) as SFA's general partner and described him as follows: Martin Kaye. Mr. Kaye is an independent tax and financial consultant. Since January 1979 he has been a consultant to VAS in connection with tax oriented investments. Mr. Kaye is also a consultant to Reliable. During 1978 he served as Vice President and Chief Financial Officer of Dia-Chem International, *137 Ltd., a broker of plasma (human) chemistry control products. Mr. Kaye was a partner of Henry Warner & Company, a New York certified public accounting firm from 1968 through 1977. Mr. Kaye is a licensed certified public accountant in the States of New York and Illinois and is a member of the New York State Society of Public Accountants and the American Institutes of Certified Public Accountants. In addition, Mr. Kaye is Vice President -- Finance and a director of BIS Communications Corporation, which is engaged in providing business information at airport terminals. He also serves as Vice President -- Finance of Goldtex Foods Corporation, a holding company that is engaged through its subsidiaries in retail baking and franchising. Mr. Kaye is a director of Sands Minerals Corporation (Canada) which invests in oil and gas programs.
In all of the Research and Development Agreements, Management and Consulting Agreements, Licensing Agreements, and Drilling Agreements entered into by the partnerships, a New York address was specified as the address for the partnership. All closing documents provided to investors specified that the investors must submit the completed documents *138 to a New York address. The partnerships opened bank accounts at New York branches of various banks. The general partners of the partnerships interviewed Gaskell for the job of managing the partnerships in New York, and the contract with Chronometer was executed in New York. At all times through at least June 1992, Gaskell maintained an office in New York, and Chronometer's letterhead showed a New York address. Although he maintained a residence in New York, Gaskell traveled to Ohio an average of twice a year in relation to business of the partnerships. Gaskell never maintained an office in Ohio. Beginning in late 1990, Gaskell traveled to Tennessee in relation to partnership business as well as in relation to an unrelated Tennessee company, Tennessee Gas Transport, Inc. Gaskell became president of Tennessee Gas Transport, Inc., and began to use an office in Tennessee in mid-1991. Prior to and including 1987, Gaskell kept the partnership records manually. Beginning in 1988, he kept the records by computer, storing them on a floppy disk that he kept with him. Other partnership records were maintained in New York, New Jersey, and Pennsylvania. The partnerships filed State tax *139 returns with New York for 1984, 1985, 1986, and 1987. The New York State tax returns showed New York addresses. Federal income tax returns for the partnerships for years through 1987 showed New York or New Jersey addresses. The partnerships filed nonresident State income tax returns with Ohio for 1982 through 1984. The Ohio State tax returns showed either New York or New Jersey addresses. Thereafter, no tax returns were filed with Ohio because the partnerships were advised by their accountants that, since there was no tax due, it was unnecessary to file Ohio income tax returns. Federal income tax returns filed on behalf of the partnerships for all material years reported substantial losses attributable to the synthetic fuel activity, management expenses, and legal fees. Oil and gas activities represented a small percentage of the transactions reported on those returns. Oil and Gas Activities
By 1987, the only revenue-producing activity of the partnerships was oil and gas drilling. The K-Fuel operations had been "mothballed". Under their respective license agreements, SFA and POGA had the nonexclusive right to use a K-Fuel reactor in North Carolina. The reactor, however, *140 was not owned by SFA and POGA. See Smith and Karr, 91 T.C. at 736-738. SFA-1982, at one time, contemplated building a plant in Michigan and, in 1983 or 1984, purchased a piece of raw land in Missouri as a back-up site for a plant. The land was never used by any of the three partnerships. Other than the land in Missouri, from 1987 through 1990, the partnerships owned no tangible assets outside of Ohio. At the time the petitions in these cases were filed, the partnerships owned working interests in various oil and gas wells in Ohio. The partnerships' interests totaled 60.2 percent of the wells. At the time the petitions were filed in the first three of these consolidated cases, POGA and SFA-1982 owned working interests in 35 oil and gas wells in Ohio. At the time the fourth and fifth petitions were filed, POGA and SFA owned working interests in 23 oil and gas wells in Ohio. At the time the last petition was filed in these cases, POGA owned working interests in 22 oil and gas wells in Ohio. Substantially all of the partnerships' income for 1987 and 1988 was produced from sales of oil and gas produced by wells in Ohio. The partnerships owned substantial *141 oil and gas well-drilling equipment located in Ohio. All of the certificates of ownership for the partnerships' interests in oil and gas wells in Ohio were substantially similar, and all contained New York addresses for the respective partnerships. None of the certificates of ownership were ever amended to show a different address. All notices of sale for wells owned by the partnerships in Ohio were also substantially similar, and all contained New York addresses for the respective partnerships. James Smail (Smail) was the drilling operator and also owned an interest in the wells located in Ohio. He was not an employee of the partnerships. Under his arrangement with each partnership, Smail owned 30 percent of each well that was drilled. Smail was not a member of any of the partnerships involved in these cases. Gaskell consulted with Smail about well purchases and drilling. Smail resided in Ohio. Robert Ferguson, who lived in Pennsylvania, owned 9.2 percent of the wells. On behalf of the partnerships, Wayne County National Bank collected revenues from purchasers of oil and gas in Ohio and received and paid bills relating to well operations. Chronometer (which had been hired *142 to manage the partnerships) and Gaskell (Chronometer's sole employee) never maintained an office in Ohio. From 1987 on, no more than a relatively small portion of Gaskell's time was devoted to managing the partnerships' business. Litigation Activities of the Partnerships
The cases of Smith and Karr were selected as test cases with respect to the POGA and SFA partnership deductions claimed for 1981 and 1982. The cases were tried in July 1987 in San Francisco, California. In relation to the trial, various records of the partnerships were transferred to the taxpayers' counsel in California. The Tax Court opinion on the deductibility to the partnerships of the payments in issue and certain additions to tax was filed October 3, 1988. Thereafter, a question arose concerning the applicability of certain additions to tax to the Smiths, and a supplemental opinion was filed at 93 T.C. 378 on September 28, 1989. In December 1989, the Smiths appealed to the Court of Appeals for the Sixth Circuit and the Karrs appealed to the Court of Appeals for the Eleventh Circuit. By an opinion filed February 27, 1991, the Eleventh Circuit affirmed the Tax Court. *143 Karr, 924 F.2d 1018. In an opinion filed June 27, 1991, the Sixth Circuit reversed the Tax Court's conclusion that the partnerships' synthetic fuel transactions lacked economic substance and remanded the case for consideration of the section 465 "at risk" contention of respondent. Smith, 937 F.2d 1089. Thereafter, respondent conceded the at risk issue. A petition for certiorari filed by the Karrs subsequent to the opinion in Smith was denied by the Supreme Court. The petition at docket No. 820-91 was filed January 14, 1991, and alleged: 2. This petition relates to Peat Oil and Gas Associates (the "Partnership"), a limited partnership organized and existing under the laws of the State of Connecticut. The Partnership's principal place of business is now at 36 South Mall, Plainview, New York 11803.
The petition at docket No. 24514-91 was filed October 25, 1991, and alleged: 2. This petition relates to Syn-Fuel Associates (the "Partnership"), a limited partnership organized and existing under the laws of the State of Connecticut. The Partnership's principal place of business is now in the State of *144 Ohio. * * *
The petition at docket No. 30440-91 was filed December 27, 1991, and alleged: 2. This petition relates to Peat Oil and Gas Associates (the "Partnership"), a limited partnership organized and existing under the laws of the State of Connecticut. The Partnership's principal place of business is now in the State of Ohio. * * *
At no time prior to the opinion of the Sixth Circuit did either partnership represent that it had a principal place of business in Ohio or in Tennessee. No formal notice was given to the limited partners of any change in the principal place of business of the partnerships. ULTIMATE FINDINGS OF FACT At all material times, the partnerships known as Peat Oil and Gas Associates, Syn-Fuel Associates, and Syn-Fuel Associates 1982 were engaged in the business of investing in and managing tax-sheltered activities. Because the partnerships had no employees, all activities of the partnerships were managed and operated through contractual arrangements with other persons. All activities were managed by Gaskell, who maintained an office in and resided in New York. On September 8, 1987, August 3, 1988, January 14, 1991, and December 27, 1991, *145 the principal place of business of Peat Oil and Gas Associates was at Gaskell's office in New York. On August 2, 1988, the principal place of business of Syn-Fuel Associates 1982 was at Gaskell's office in New York. On October 25, 1991, the principal place of business of Syn-Fuel Associates was at Gaskell's office in New York. OPINION Petitioners contend that, at the time the petitions in these cases were filed, the principal places of business of the partnerships were in Ohio, where the income-producing assets of the partnerships were located. Respondent contends that the principal places of business of the partnerships were in New York, where their business decisions were made, or, in the alternative, were in New York because the partnerships represented to the public, through their formation documents, tax returns, business records, contracts, correspondence, bank accounts, and other writings, that their principal places of business were located in New York. Although certain relevant events occurred in New Jersey, Connecticut, or Tennessee, as indicated in our findings of fact, the arguments of the parties and the applicable law suggest that either New York or Ohio is the *146 principal place of business of these partnerships. In view of the minimal activities of the partnerships during the years in which the petitions were filed, it is arguable that they had no principal place of business so that venue for appeal is the Court of Appeals for the District of Columbia. Sec. 7482(b). Because this factual conclusion has not been suggested or argued by the parties, we do not address it here. Ordinarily, a trial court would not be deciding as the issue before it the venue for appeal of its decision. In this instance, however, we are deciding venue because of the Golsen rule cited by the parties in their stipulation. Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Ordinarily, if a trial court has been reversed on a factual determination involving the same or related parties, the issue becomes one of stare decisis, law of the case, or collateral estoppel. Usually, the Golsen rule is not cited in relation to a factual determination but, rather, as a matter of determining the rule of law to be applied in a particular case. That is, we "follow a Court of Appeals *147 decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone." Golsen v. Commissioner, 54 T.C. at 757. In these circumstances, it is appropriate for us to consider the issue of venue, although the reviewing court will undoubtedly make its own determination. Brewin v. Commissioner, 72 T.C. 1055, 1059 (1979), revd. and remanded on another issue 639 F.2d 805 (D.C. Cir. 1981). Venue for Purposes of Section 7482(b)(1)
Section 7482(b)(1) provides with respect to review of decisions of the Tax Court: (b) Venue. -- (1) In general. -- Except as otherwise provided in paragraphs (2) and (3), such decisions may be reviewed by the United States court of appeals for the circuit in which is located -- (A) in the case of a petitioner seeking redetermination of tax liability other than a corporation, the legal residence of the petitioner, (B) in the case of a corporation seeking redetermination of tax liability, the principal place of business or principal office or agency of the corporation, or, if it has no principal place of business *148 or principal office or agency in any judicial circuit, then the office to which was made the return of the tax in respect of which the liability arises, (C) in the case of a person seeking a declaratory decision under section 7476, the principal place of business, or principal office or agency of the employer, (D) in the case of an organization seeking a declaratory decision under section 7428, the principal office or agency of the organization, or (E) in the case of a petition under section 6226 or 6228(a), the principal place of business of the partnership.
If for any reason no subparagraph of the preceding sentence applies, then such decisions may be reviewed by the Court of Appeals for the District of Columbia. For purposes of this paragraph, the legal residence, principal place of business, or principal office or agency referred to herein shall be determined as of the time the petition seeking redetermination of tax liability was filed with the Tax Court or as of the time the petition seeking a declaratory decision under section 7428 or 7476, or the petition under section 6226 or 6228(a), was filed with the Tax Court.
Prior to addition of the Tax Equity and Fiscal *149 Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 402(c)(15), 96 Stat. 648, 668, partnership provisions in 1982, petitions with respect to partnership adjustments were filed by the individual partners and not by the partnership; therefore, no venue provision for partnership appeals was necessary or appropriate. Venue for appeal in a case commenced with the filing of a petition by an individual partner, as in Smith and Karr, was determined by the residence of the individual partner. The Supreme Court has recently interpreted the phrase "principal place of business" with reference to section 280A in Commissioner v. Soliman, 506 U.S.    , 113 S. Ct. 701 (Jan. 12, 1993). The Court stated, inter alia: In interpreting the meaning of the words in a revenue act, we look to the "'ordinary, everyday senses'" of the words. Malat v. Riddell, 383 U.S. 569, 571 (1966) (per curiam) (quoting Crane v. Commissioner, 331 U.S. 1, 6 (1947)). In deciding whether a location is "the principal place of business," the common sense meaning of "principal" suggests that a comparison of locations *150 must be undertaken. This view is confirmed by the definition of "principal," which means "most important, consequential, or influential." Webster's Third New International Dictionary 1802 (1971). Courts cannot assess whether any one business location is the "most important, consequential, or influential" one without comparing it to all the other places where business is transacted. * * * The statute does not refer to the "principal office" of the business. If it had used that phrase, the taxpayer's deduction claim would turn on other considerations. The statute refers instead to the "principal place" of business. It follows that the most important or significant place for the business must be determined. B
In determining the proper test for deciding whether a home office is the principal place of business, we cannot develop an objective formula that yields a clear answer in every case. The inquiry is more subtle, with the ultimate determination of the principal place of business being dependent upon the particular facts of each case. There are, however, two primary considerations in deciding whether a home office is a taxpayer's principal place of business: the relative *151 importance of the activities performed at each business location and the time spent at each place. Analysis of the relative importance of the functions performed at each business location depends upon an objective description of the business in question. This preliminary step is undertaken so that the decisionmaker can evaluate the activities conducted at the various business locations in light of the particular characteristics of the specific business or trade at issue. Although variations are inevitable in case-by-case determinations, any particular business is likely to have a pattern in which certain activities are of most significance. If the nature of the trade or profession requires the taxpayer to meet or confer with a client or patient or to deliver goods or services to a customer, the place where that contact occurs is often an important indicator of the principal place of business. A business location where these contacts occur has sometimes been called the "focal point" of the business and has been previously regarded by the Tax Court as conclusive in ascertaining the principal place of business. See 94 T.C., at 24-25. We think that phrase *152 has a metaphorical quality that can be misleading, and, as we have said, no one test is determinative in every case. We decide, however, that the point where goods and services are delivered must be given great weight in determining the place where the most important functions are performed. * * * Though not conclusive, the point where services are rendered or goods delivered is a principal consideration in most cases. If the nature of the business requires that its services are rendered or its goods are delivered at a facility with unique or special characteristics, this is a further and weighty consideration in finding that it is the delivery point or facility, not the taxpayer's residence, where the most important functions of the business are undertaken. [113 S. Ct. at 705-707.]
The Supreme Court's statements, of course, were made in the context of an individual taxpayer's office in the home and whether such office qualified as the principal place of business of the individual taxpayer for the purpose of claiming home office deductions. The briefs of the parties in these cases were filed prior to the Supreme Court's opinion in Soliman. *153 In their briefs, the parties deal extensively with cases determining the principal place of business of a corporation for diversity jurisdiction and with bankruptcy cases determining the principal place of business of a partnership for venue purposes. In those cases, of course, trial venue was the issue, not, as in these cases, appellate venue. For purposes of diversity jurisdiction, a corporation is a citizen of any State where it is incorporated and of the State where it has its principal place of business. 28 U.S.C. sec. 1332(c) (1988). A different rule, however, pertains when determining whether complete diversity exists for a partnership or a limited partnership. In the case of a limited partnership, the citizenship of the limited and general partners must be examined for purposes of determining whether there is complete diversity. See Carden v. Arkoma Associates, 494 U.S. 185, 196-197 (1990). The two tests for "principal place of business" developed in diversity cases are summarized in Industrial Tectonics, Inc. v. Aero Alloy, 912 F.2d 1090, 1092 n.3, 1094 (9th Cir. 1990), *154 as follows: 3/ These two tests [the "nerve center test" and the "place of operations" test] can be viewed as particular applications of a general rule that the "bulk of corporate activity," as evidenced by operating, administrative, and management activities, determines a corporation's principal place of business. * * * [912 F.2d at 1092 n.3.] * * * This application of [28 U.S.C.] section 1332(c) is appropriate for several reasons. First, a corporation usually has its greatest contacts with the public where it conducts most of its business, rather than where internal policy decisions are made. Activities such as employment of personnel, purchasing of materials, and sales of goods and services increase local familiarity with the corporation. This local contact alleviates problems with local prejudice against outsiders and justifies consideration of the corporation as a citizen of that state. * * * Second, suits involving a corporation generally arise from its contacts with the public. Thus, considering a corporation to be a citizen of the state where it has the most public contact and greatest potential for litigation helps reduce the federal *155 court diversity case load, which is a primary goal of the "principal place of business" provision of the diversity statute. Third, the diversity statute's legislative history indicates that a corporation's principal place of business generally should be where most business operations are carried out rather than where policy making functions are carried out. When quantifying corporate activity to determine a corporation's principal place of business, one must keep in mind that the purpose of diversity jurisdiction is to avoid the effects of prejudice against outsiders. Thus, the principal place of business should be the place where the corporation conducts the most activity that is visible and impacts the public, so that it is least likely to suffer from prejudice against outsiders. * * * [Citations omitted; 912 F.2d at 1094.]
See also Riggs v. Island Creek Coal Co., 542 F.2d 339 (6th Cir. 1976), in which the Court of Appeals for the Sixth Circuit determined that a corporation's principal place of business was in Ohio where its corporate headquarters was located, although its mining operations were conducted in three *156 other States. For bankruptcy venue purposes, a case may be commenced in the district in which the debtor has its domicile, residence, principal place of business, or principal asset for the 180 days immediately prior to the commencement of the case. 28 U.S.C. sec. 1408 (1988). In 1973, the predecessor to 28 U.S.C. sec. 1408 (1988) was amended to allow venue in Chapter XI proceedings at either the debtor's principal place of business or where its principal assets are located. In bankruptcy cases, the proper venue for an action commenced by a partnership is recognized as difficult to ascertain because of the difficulty in determining the residence of domicile of a partnership. Thus the bankruptcy courts have applied two tests, i.e., where the partnership has its principal place of business (the "nerve center" test) or has its principal assets in the United States (the "bulk of activity" test). In re Vienna Park Properties, 120 Bankr. 320, 326-327 (Bankr. S.D.N.Y. 1990), vacated and remanded on another issue 125 Bankr. 84 (S.D.N.Y. 1991). Petitioners *157 argue that the use of the two terms "principal place of business" and "principal office or agency" in specifying venue for appeals filed by corporations under section 7482(b)(1)(B) implies a clear difference between those two places. Petitioners' argument is based on the legislative history of 28 U.S.C. sec. 1402(a)(2) (1988) establishing trial venue for tax refund actions and proceedings. Petitioners' brief argues as follows: The Senate version of the bill provided that venue for a corporation was to be in the district in which the principal place of business or the principal office or agency was located. S. Rep. No. 2445, 85th Congress, 2d Sess. (1958), 1958-3 C.B. 1235. The House version of the bill deleted the phrase "principal office or agency" on the grounds that it might add uncertainty. The House report pointed out that the phrase "principal place of business" had become a term of art since it had been used for more than 50 years in the Bankruptcy Act and in other federal statutes and had come to have a well-defined meaning as a result of many judicial decisions. H.R. Rep. No. 1715, 85th Cong., *158 2d Sess. (1958), 1958-3 C.B. 1233, 1234. The Senate Report issued three months later responded to this criticism, stating that the phrase "principal office or agency" had been taken from the language of Section 6091(b)(2) of the Internal Revenue Code of 1954. The Senate Report goes on to state: Thus, while it is true that "principal place of business" may well have a well-defined meaning by virtue of judicial decisions in cases involving bankruptcy, the phrase "principal office or agency" is likewise well known terminology in the Internal Revenue laws. Since the instant legislation applies to venue in Internal Revenue cases, it would seem more desirable to have the language of the venue statute conform to the language of the Internal Revenue Code. Permission to bring suit at the place where the tax returns have been filed will place venue at the area of principal contact of the taxpayer for the officials of the Internal Revenue Service and others concerned with the disposition of tax liability.
S. Rep. No. 2445, supra, at 1236. Significantly, the law as passed used both the phrase principal office or agency and principal place of business. *159 Thus, the legislative history makes clear that a corporation's principal place of business and its principal office or agency are not synonymous, and that it was intended that corporations have a choice of venue. * * *
We are persuaded that the principal place of business of a corporation and its principal office are not necessarily synonymous. It does not follow, however, as petitioners assert, that this "legislative history shows that a partnership's principal place of business is not where its books and records are located, nor where executive decisions are made, but where its assets are located, income earned and operations conducted." Arguably, if Congress wanted to have venue under section 7482(b)(1)(E) lie where a partnership's principal assets were located, it would have so specified in language similar to that in 28 U.S.C. sec. 1408 (1988). The most that we can conclude from this legislative history regarding corporations is that Congress believed that the phrase "principal place of business" had become a term of art through use in the Bankruptcy Act and other Federal statutes. The common theme of Soliman and of the cases *160 cited in the briefs of the parties is that all relevant facts and circumstances must be considered. See In re Commonwealth Oil Refining Co., 596 F.2d 1239, 1244-1247 (5th Cir. 1979); Continental Coal Corp. v. Roszelle Bros., 242 F. 243 (6th Cir. 1917). The focus in these cases must be on the relative importance of the functions performed at each business location, and that depends "upon an objective description of the business in question * * * so that the decisionmaker can evaluate the activities conducted at the various business locations in light of the particular characteristics of the specific business or trade at issue." Commissioner v. Soliman, 506 U.S.    , 113 S. Ct. 701, 706 (Jan. 12, 1993). In Soliman, the Court also stated that, "Although variations are inevitable in case-by-case determinations, any particular business is likely to have a pattern in which certain activities are of most significance." 113 S. Ct. at 706. The Court further stated that "the point where services are rendered or goods delivered is a principal consideration in most *161 cases." 113 S. Ct. at 707. Petitioners' business, however, did not involve delivery of goods or rendition of services. We concluded in Smith and Karr, 91 T.C. at 761, that the substance of the structure of these partnerships was capital investment, rather than an active business. The Court of Appeals for the Sixth Circuit disagreed with our characterization and stated that "the partnerships were risk venture operations carrying on a trade or business within the meaning of the tax laws." Smith, 937 F.2d at 1095. The Court of Appeals also, however, focused on the investment aspects of the transaction. Smith, 937 F.2d at 1096. Applying either description, the business of these partnerships is managing assets. These partnerships are, in that regard, comparable to the real property holding partnerships in the bankruptcy cases cited by respondent, In re Garden Manor Associates, L.P., 99 Bankr. 551, 553 (Bankr. S.D.N.Y. 1988), and In re Vienna Park Properties, 120 Bankr. 320, 328 (Bankr. S.D.N.Y. 1990), *162 vacated and remanded on another issue 125 Bankr. 84 (S.D.N.Y. 1991). See also In re Commonwealth Oil Refining Co., 596 F.2d 1239, 1244-1247 (5th Cir. 1979). In cases involving such investment partnerships, the principal place of business is not where the property is located but where decisions are made. Petitioners do not and cannot specify any particular location that is the partnerships' place of business in Ohio. No employees of the partnerships were engaged in drilling operations. At various material times, the partnerships had fractional interests in 35, 23, or 22 oil wells. The location and timing of these interests appear to be fortuitous. Gaskell testified as follows: "Well, by 1987, the only activity was oil and gas and once a well is drilled, and once a well is on line, the remaining activity is really straightforward. If everything goes right, there's nothing to do but cash a check." Although the revenues were collected and expenses paid through a bank in Ohio, no one has suggested that the address of the bank is the principal place of business of the partnerships. Although Gaskell spent little time in relation *163 to partnership activities overall, there is no evidence that he or any partner (other than Smith) spent a significant amount of time in Ohio compared to time spent elsewhere in relation to partnership affairs. These partnerships only required expenditure of time in relation to management functions, not operations. Although the oil and gas activities of the partnerships consisted of fractional interests in wells and drilling equipment in Ohio, management of those activities occurred in New York. Gaskell testified that Chronometer's contract was "to run all the administrative and day to day operation of the partnerships." Over the years, most of the time of Gaskell and of the managing partners in relation to the partnerships was undoubtedly spent on litigation centered around the trial in San Francisco, California, in July 1987. Gaskell testified that most of his time in 1987 was related to the litigation. That activity has continued at least through the trial on the venue issue in 1992 (conducted in Los Angeles, California). Litigation procedures under TEFRA focus heavily on designation and activity of the tax matters partner: The tax matters partner is the central figure *164 of partnership proceedings. During both administrative proceedings and litigation, the tax matters partner serves as the focal point for service of all notices, documents, and orders on the partnership. The statutorily determined time periods for respondent to notify the other partners of the status of the administrative proceeding at the partnership level (sec. 6223(d)), for a partner to file a petition for judicial review (sec. 6226), or for the partnership to request an administrative adjustment (sec. 6227) are determined with reference to the tax matters partner. The tax matters partner is the only partner who may file a petition for judicial review if an administrative adjustment is not allowed in full (sec. 6228), and the only partner who may file a petition for judicial review within the first 90 days after respondent issues a notice of final partnership administrative adjustment to him. Sec. 6226(a); Transpac Drilling Venture 1982-22 v. Commissioner, 87 T.C. 874 (1986). The tax matters partner must also perform important functions within the partnership. He is required to keep all partners informed of the status of administrative and judicial *165 proceedings involving the partnership. Sec. 6223(g). Moreover, the tax matters partner may, under some circumstances, bind partners who are not notice partners by entering into a settlement agreement with respondent. Sec. 6224(c)(3). [Computer Programs Lambda, Ltd. v. Commissioner, 89 T.C. 198, 205 (1987).]
Goldman, who lived in New Jersey, Kaye, who lived in New York, and Gaskell, who lived in New York, were the designated tax matters partners in these cases. Goldman and Kaye were also the general partners, and Gaskell, as the sole employee and operative of Chronometer, was the person actually performing management functions. In view of the importance of tax benefits to these partnerships (see Smith and Karr, 91 T.C. at 742, 748), tax litigation is a central part of the partnership business, if not their "most important" function. The amount of time spent on that activity is neither incidental nor fortuitous. Communication among the partners and their representatives and with third parties was consistently directed to New York addresses. The partnership agreement of each partnership requires the limited *166 partners to be notified of any change in the principal office or place of business of the partnership or of the establishment of additional offices. The limited partners of each partnership were never given notice of any change in the principal place of business of their partnership. All of the certificates of ownership for the partnerships' interest in oil and gas wells and all of the notices of sale for wells owned by the partnerships in Ohio contained New York addresses for the respective partnerships. It is difficult to conceptualize a principal place of business that is not the place where the partnerships maintained contact with the outside world. See Commissioner v. Soliman, 506 U.S.    , 113 S. Ct. 701, 706 (Jan. 12, 1993): "If the nature of the trade or profession requires the taxpayer to meet or confer with a client or patient or to deliver goods or services to a customer, the place where that contact occurs is often an important indicator of the principal place of business." To agree with petitioners, we would have to hold that the principal place of business of these partnerships was at an indefinite location in the State of Ohio, *167 where there were no employees or offices of the partnerships where the partnerships could be reached. A principal place of business should at least have a mailing address. Among the significant facts and circumstances in the cases at issue here are the partnerships' representations, in the petitions in the earlier of these cases, and public pronouncements, up to the time of the favorable Sixth Circuit opinion, that the principal place of business of the partnerships was in New York. The limited partnership agreements of each partnership specified the principal office of each partnership as its principal place of business. Because these representations were made at times when no forum shopping motivation was apparent, they are more reliable as an indication of petitioners' bona fide place of business than subsequent allegations that the principal place of business was in Ohio. Even if admissions are not relevant to a determination of which of several places of business is principal to the partnerships, the representations of the partnerships as to where they should be contacted by the partners and the public must be given weight. See Commissioner v. Soliman, supra. *168 We have analyzed this issue with the guidance of the Supreme Court's language in Soliman. The context of Soliman and of these cases, however, is very different. Soliman was concerned with conditions on a taxpayer's entitlement to a business deduction for expenses of an office in the home. Section 7482(b)(1)(E) simply advises parties of the proper venue for an appeal. A taxpayer's assertion that his home is his principal place of business need not be given much weight when his entitlement to a deduction depends on the location of his principal place of business. In the context of a determination of principal place of business for purposes of deciding venue on appeal, however, the parties and the courts should be entitled to rely on the representations of the entity made at a time when forum shopping was not apparent. Persons doing business of any sort with these partnerships -- whether financial, operational, or litigation activities were involved -- were directed to New York as the principal place of business of these partnerships. For the foregoing reasons, we conclude that New York was the principal place of business of the three partnerships at the time that *169 all of the petitions were filed. Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Syn-Fuel Associates, 1982, John McCurdy, A Partner Other Than the Tax Matter Partner, docket No. 20081-88; Peat Oil and Gas Associates, James Karr, A Partner Other Than the Tax Matters Partner, docket No. 20130-88; Peat Oil and Gas Associates, A Limited Partnership, Joseph Yadgaroff, A Partner Other Than the Tax Matters Partner, docket No. 820-91; Syn-Fuel Associates, A Limited Partnership, Keith Gaskell, A Partner Other Than the Tax Matters Partner, docket No. 24514-91; and Peat Oil and Gas Associates, A Limited Partnership, Robert Ferguson, A Partner Other Than the Tax Matters Partner, docket No. 30440-91.↩