**UVIADO, LLC, by and through Shahid R. KHAN a partner other than the Tax Matters Partner, Plaintiff,**

v.

**UNITED STATES of America, by and through the INTERNAL REVENUE SERVICE, Defendant.**

**Leman, LLC, by and through Jonction LLC a partner other than the Tax Matters Partner, Plaintiff,**

v.

**United States of America, by and through the Internal Revenue Service, Defendant.**

**Civil Action Nos. H–09–0052, H–09–0065.**

United States District Court, S.D. Texas, Houston Division.

Aug. 2, 2010.

Linda Schulze Paine, Lawrence W. Sherlock, Chamberlain Hrdlicka et al., Houston, TX, for Plaintiff.

Grover Hartt, III, Department of Justice, Dallas, TX, Jonathan L. Blacker, Attorney at Law, Dallas, TX, Joshua David Smeltzer, Dallas, TX, for Defendant.

## MEMORANDUM AND OPINION

LEE H. ROSENTHAL, District Judge.

In January 2009, two investment partnerships, Uviado, LLC and Leman, LLC, filed these lawsuits against the United States, seeking readjustment of partnership items proposed in two notices of Final Partnership Administrative Adjustment ("FPAA") issued in August 2008 by the Commissioner of the Internal Revenue Service. The issue addressed in this opinion is venue, which turns on the partnerships' principal place of business.

The plaintiffs contend that in late 2008, they moved the principal place of their business to Houston, Texas. The United States argues that Uviado and Leman attempted to "manufacture venue" in Houston shortly before filing these lawsuits in order to take advantage of Fifth Circuit case law relating to penalties that is more favorable to Khan than the law in the alternative available venues. Those alternatives are the Tax Court, the Court of Federal Claims, the Central District of Illinois, or the District of Connecticut. (Uviado Docket Entry No. 16–1 at 9–13). According to the United States, even disregarding the plaintiffs' motivation to "manufacture" venue in Texas, their efforts to do so were ineffective under the applicable law. That law includes the Supreme Court's recent clarification of the iconic phrase "principal place of business" in 28 U.S.C. § 1332(c) to mean, for a corporation, its "nerve center," the "actual center of direction, control, and coordination" by the officers. *Hertz Corporation v. Friend,* —— U.S. ——, 130 S.Ct. 1181, 1192, 175 L.Ed.2d 1029 (2010).

The United States has moved to transfer venue to the Central District of Illinois under 28 U.S.C. § 1406(a), asserting that venue is improper in Houston, Texas. The parties conducted discovery limited to the venue issue and exchanged briefs. Based on the motion, response, reply, and surreply;[1] the record; and the applicable law,

---

1. The United States' motions are Uviado Docket Entry No. 15 and Leman Docket Entry No. 15. The plaintiffs responded, Uviado Docket Entry No. 18, Leman Docket Entry No. 16; the United States replied, Uviado Docket Entry No. 19, Leman Docket Entry No. 17; and the parties exchanged surreplies, Uviado Docket Entry Nos. 20, 21, Leman Docket Entry Nos. 18, 19. This court also granted the United States' motions to supplement, Uviado Docket Entry Nos. 25, 26, Leman Docket Entry Nos. 23, 24. The plaintiffs filed unopposed motions for clarification of the supplemental filing, Uviado Docket Entry No. 27, Leman Docket Entry No. 25; the United States responded, Uviado Docket Entry No. 28, Leman Docket Entry No. 26, and the plaintiffs replied, Uviado Docket Entry No. 29, Leman Docket Entry No. 27. The motions, responses, and replies filed in both cases are identical. The partnerships' motions for clarification of the United States' supplemental filing, Uviado Docket Entry No. 27 and Leman Docket Entry No. 26, are granted.

this court concludes that the principal place of business for Uviado, LLC, and Leman, LLC at the relevant time was not Houston, Texas, but rather Champaign–Urbana, Illinois. Accordingly, the motions to transfer are granted and these cases are transferred to the Central District of Illinois, Urbana Division.

The reasons are explained below.

## I. Background

In early January 2009, Uviado, LLC, through its partner, Shahid R. Khan, and Leman, LLC, through its partner, Jonction, LLC (of which Khan was a partner and sole manager), sued the United States seeking readjustment of partnership items proposed in two notices of Final Partnership Administrative Adjustment ("FPAA") issued by the IRS. The United States asserts that through these and three other earlier partnerships, Shahid Khan, who lives and has a business in Illinois, engaged in a series of transactions to shelter "virtually all of his income"—approximately $250,000,000—from taxation. Both partnerships claim that venue is proper under 26 U.S.C. § 6226 and 28 U.S.C. § 1402 in the Southern District of Texas, Houston Division, because their principal places of business are in Houston. The only issue litigated so far has been whether venue is proper in Houston, Texas or Urbana, Illinois.

### A. The Underlying Tax Issues: The Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA")

TEFRA was enacted "to improve the auditing and adjustments of income tax items attributable to partnerships." *Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 446 n. 1 (5th Cir.2008) (citing *Alexander v. United States*, 44 F.3d 328, 330 (5th Cir.1995)). TEFRA established "a single unified procedure for determining the tax treatment of all partnership items at the partnership level, rather than separately at the partner level." *Id.* (citing *Callaway v. Comm'r*, 231 F.3d 106, 108 (2d Cir.2000)). Partnerships are not subject to federal income taxes. 26 U.S.C. § 701. "Instead, a partnership is treated as a conduit through which income passes to its partners, who are responsible for reporting their pro rata share of tax on their individual income tax returns." *Duffie v. United States*, 600 F.3d 362, 365 (5th Cir.2010). While not subject to tax, the partnerships file informational tax returns. *Id.* The Act "consolidated the partnership-level audit and adjustment procedures by requiring that 'the tax treatment of any partnership item shall be determined at the partnership level.'" *Id.* (quoting 26 U.S.C. § 6221). After TEFRA, rather than conducting individual partner-level proceedings, the IRS can collectively adjust partnership items in a single proceeding and assess the partners separately based on the adjustments. *Id.* (citing *Prati v. United States*, 81 Fed.Cl. 422, 427 (2008)).

The IRS notifies the individual partners of an adjustment by issuing an FPAA. 26 U.S.C. § 6223. The FPAA sets out the IRS's adjustments and provides the grounds for the adjustment. *Duffie*, 600 F.3d at 366. The tax matters partner—the partner "designated to act as a liaison between the partnership and the IRS in administrative proceedings and as the representative of the partnership in judicial proceedings"—has the exclusive right to challenge the proposed adjustments for ninety days following issuance of the FPAA. *Id.* at 365 n. 1; *see* 26 U.S.C. § 6226(a). If the tax matters partner does not file suit challenging the FPAA within ninety days, the other partners have sixty days to file a petition for readjustment. 26 U.S.C. § 6226(b)(1); *Duffie*, 600 F.3d at

366. "If a partnership level challenge is filed, each partner in the partnership is deemed a party to the case." *Duffie*, 600 F.3d at 367 (citing 26 U.S.C. § 6226(c)(1)).

## B. The Venue Provisions

The Internal Revenue Code requires a partner to file a petition challenging the FPAA in one of three places: "(1) the Tax Court, (2) the district court of the United States for the district in which the partnership's principal place of business is located, or (3) the Court of Federal Claims." 26 U.S.C. § 6226(a). As to the second option, the Treasury Regulations state: "The principal place of a partnership's business for purposes of determining the appropriate district court in which a petition for a readjustment of partnership items may be filed is its principal place of business as of the date the petition is filed." 26 C.F.R. § 301.6226(a)–1. The regulations give an example of a partner-

ship that moves its principal place of business after the date the IRS issues an FPAA but before the complaint seeking judicial review of that adjustment is filed. *Id.* § 301.6226(a)–1(b). The term "principal place of business" is not defined in the Internal Revenue Code. No cases interpret the meaning of "principal place of business" in the specific context of 26 U.S.C. § 6226 nor cite 26 C.F.R. § 301.6226(a)–1.

The United States argues that the partnerships' primary place of business was not in the Southern District of Texas when the petitions were filed and seeks to transfer the case to the Central District of Illinois under 28 U.S.C. § 1406(a). The parties agree that a partnership can have only one principal place of business.

## C. The Facts Relevant to Venue

The relevant facts are largely undisputed.[2] The legal significance of those facts is

2. In support of its motion to transfer venue, the United States attached the declaration of Joshua D. Smeltzer, an attorney in the Tax Division of the United States Department of Justice, and associated exhibits, (Uviado Docket Entry No. 15–3); the declaration of Gerald A. Thorpe, Senior Counsel for the Internal Revenue Service Office of Chief Counsel, (Uviado Docket Entry No. 15–4); the deposition of Shahid R. Khan, (Uviado Docket Entry No. 15–5); the deposition of an accountant the partnerships hired in Houston, Gary Biggers, (Uviado Docket Entry No. 15–6), and the exhibits from the Biggers deposition, including the partnerships' engagement letter with Chamberlain, Hrdlicka, White, Williams & Martin, (Uviado Docket Entry No. 15–7); Khan's assignment of a membership interest in SRK, (Docket Entry No. 15–8); the partnerships' operating agreements, (Uviado Docket Entry Nos. 15–9–15–15); investment statements for Uviado, (Uviado Docket Entry Nos. 15–16–15–18; 15–20–15–23); Uviado's investment services agreement with U.S. Trust, (Uviado Docket Entry No. 15–19); Biggers's engagement letter, (Uviado Docket Entry No. 15–24); discovery responses, (Uviado Docket Entry Nos. 15–25, 15–26); the part-

nerships' virtual office agreements for the Houston office, (Uviado Docket Entry Nos. 15–27, 15–28); photographs of the partnerships' Houston office, (Uviado Docket Entry Nos. 15–29–15–37); Uviado's application for a checking account at Frost National Bank, account statements, and checks paid, (Uviado Docket Entry No. 15–38); Leman's application for a checking account at Frost National Bank and statements, (Uviado Docket Entry No. 15–39); and SRK's Frost National Bank application, statements, and checks paid, (Uviado Docket Entry No. 15–40).

In response, the partnerships attached the declaration of the partnerships' counsel, Linda S. Paine, (Uviado Docket Entry No. 18–3), and exhibits including SRK's Houston lease, (Uviado Docket Entry No. 18–4); SRK's August 2008 consent action, (Uviado Docket Entry No. 18–5); SRK's October 2008 Frost Bank statement, (Uviado Docket Entry No. 18–6); Biggers's engagement letter, (Uviado Docket Entry No. 18–7); SRK's consent action appointing Biggers an officer, (Uviado Docket Entry No. 18–8); SRK's, Uviado's, and Leman's applications for registration in Texas, (Uviado Docket Entry Nos. 18–9, 18–10, 18–11); Uviado's and Leman's applica-

vigorously contested. A chronological summary of the relevant facts is set out below.

The tax years at issue are 2002 and 2003. The taxpayers at issue are Shahid Khan and his wife. Shahid Khan is a businessman who for over forty years has lived and worked in Champaign–Urbana, Illinois. Khan is the president of Flex–N–Gate Corporation ("FNG"), which is headquartered in Urbana, Illinois. Khan lives at 1102 Wilshire Court in Champaign, Illinois. In 2002, Khan reported $68,420,913 in wages and non-passive and passive income from FNG. (Uviado Docket Entry No. 15–3, Smeltzer Decl., Ex. A). In 2003, Khan reported $55,149,740 in wages and non-passive and passive income from FNG. (*Id.*, Ex. B). The transaction involving Uviado occurred in 2002 and Leman in 2003. Both transactions were promoted by an entity affiliated with Gramercy, "a boutique investment management firm" specializing in distressed debt investments. (Uviado Docket Entry No. 1 at 3). Gramercy is a limited liability company orga-

nized under Delaware law with its principal office in Greenwich, Connecticut.[3]

### 1. 2002

Uviado was formed in Delaware in 2002. According to Uviado's complaint in this case, Gramercy formed the investment partnership "to actively invest in U.S. and non-U.S. denominated distressed debt instruments." (*Id.* at 4). In 2002, Uviado had five members. Khan had an 85.63 percent interest in Uviado. The remaining interest was held by entities related to Gramercy. (Docket Entry No. 15–9, Exhibit 5 at 40). The initial operating agreement for Uviado stated that its "principal office" was in Greenwich, Connecticut "or at such other address as the Sole Manager shall determine in its sole discretion." (*Id.* at 6).

The United States explains that in the 2002 tax year, Uviado was a "Distressed Asset/Debt" or "DAD" tax shelter. (Uviado Docket Entry No. 16–1 at 4). The United States alleges that Uviado bought "worthless Brazilian debts through transactions designed to disguise the true eco-

tions for checking accounts at Frost National Bank and initial deposits, (Uviado Docket Entry No. 18–12); minutes of the partnerships' board meetings, (Uviado Docket Entry Nos. 18–13–18–14, 18–30–18–41); Uviado's and Leman's December 23, 2008 consent actions, (Uviado Docket Entry Nos. 18–15, 18–16); Uviado's and Leman's operating agreements, (Uviado Docket Entry Nos. 18–17–18–24); the partnerships' engagement letter with Chamberlain, Hrdlicka, White, Williams & Martin, (Uviado Docket Entry No. 18–25); the partnerships' virtual office agreements, (Uviado Docket Entry Nos. 18–26, 18–27); a laptop and accessories receipt, (Uviado Docket Entry No. 18–28); a January 1, 2009 Harris County Property Rendition, (Uviado Docket Entry No. 18–29); Uviado's and Leman's Investment Services Agreements, (Uviado Docket Entry Nos. 18–42, 18–43); a trust account email confirming initial funding, (Uviado Docket Entry No. 18–44); the affidavit of Thomas Clarkson, the treasurer of SRK, (Uviado Docket Entry No. 18–45); the affidavit of

Gary W. Biggers, (Uviado Docket Entry No. 18–46); the partnerships' applications for extension of time to file tax returns, (Uviado Docket Entry Nos. 18–47, 18–48); the Biggers deposition errata sheet, (Uviado Docket Entry No. 18–49); SRK's Houston office lease renewal, (Uviado Docket Entry No. 18–50); and Khan's deposition, (Uviado Docket Entry Nos. 18–51–18–59).

**3.** Gramercy Asset Management, LLC is an affiliate of Gramercy Advisors LLC. (Leman Docket Entry No. 1 at 3). The Uviado complaint stated that Gramercy Advisors, LLC formed Uviado. (Uviado Docket Entry No. 1 at 3). The Leman complaint stated that Gramercy Advisors, LLC formed Leman and that Gramercy Asset Management, LLC was a partner in 2003. (Leman Docket Entry No. 1 at 3, 5). The United States alleged that Gramercy Asset Management, LLC was the promoter for both partnerships and did not mention Gramercy Advisors, LLC. (Uviado Docket Entry No. 16–1 at 4).

nomics of the transaction." (*Id.*). According to the plaintiff, in 2002 Uviado sold a portion of the Brazilian trade receivables it purchased for an investment loss, which it allocated to its partners. The partners reported the loss on their tax returns. The plaintiff asserts that the transactions had a bona fide business purpose and economic substance. That issue is the basis of this tax suit.

## 2. 2003

On May 21, 2003, Khan executed an initial operating agreement for Leman as the sole manager of Jonction LLC. Khan had a controlling interest in Jonction in 2003. That partner acquired 98.90 % of Leman; the remainder was owned by a Gramercy affiliate and later acquired by Khan.

The initial operating agreement for Leman stated that its principal office was in Greenwich, Connecticut "or at such other address as the Sole Manager shall determine in its sole discretion." (Docket Entry No. 15–14, Ex. 10 at 6). The Leman transaction was similar to the Uviado transaction. According to the complaint, Khan contributed cash and assets to Jonction, which contributed Brazilian receivables and cash to Leman. Leman sold some of its Brazilian receivables in 2003, resulting in a loss, which Khan reported on his income tax return. The United States cites an opinion issued in a related case,

*Khan v. United States,* 548 F.3d 549, 551 (7th Cir.2008), stating that through these 2002 and 2003 tax shelters, as well as tax shelters used in 1999, 2000, and 2001, Khan failed to pay approximately $85,000,000 in taxes due on his income for the five years.[4]

## 3. 2006

Uviado's operating agreement was amended dated May 1, 2006 to state that the "principal office" was at 1102 Wilshire Court, Champaign, IL, 61821. This is Khan's home address. (Docket Entry No. 15–10, Ex. 6 at 4). It is also the address of an entity Khan owned and controlled, SRK Wilshire, Inc. Khan's initials are "SRK." Khan acknowledges that in 2006, documents that would have removed Gramercy as manager and tax matters partner of Uviado were drafted and partly signed but did not become effective because the parties could not reach agreement on all matters. (Docket Entry No. 18–1 at 4).[5]

## 4. 2008

On August 13, 2008, the Internal Revenue Service issued an FPAA for the 2002 tax year to Uviado in the amount of $80,691,147. (Uviado Docket Entry No. 1–1, Ex. A). On August 18, 2008, the IRS issued an FPAA for the 2003 tax year to Leman in the amount of approximately $66.5 million. (Leman Docket Entry No. 1–1, Ex. A). The notices were sent to

---

**4.** Khan has been involved in other litigation regarding these and similar entities. *See Khan v. United States,* 548 F.3d 549 (7th Cir. 2008) (holding that 26 U.S.C. § 7602(d)(1) did not bar the IRS from summoning the Khans' accountant during the IRS's investigation of the Khans in connection with SRK and Uviado, among other entities); *Khan v. United States,* Nos. 07–50407, 07–50418, 07–50419, 07–50421, 07–50422, 07–50423, 2009 WL 1034796 (E.D.Mich. Apr. 15, 2009) (denying the Khans' motion to quash summons issued to their accountant for SRK and Uviado, among other entities).

**5.** The partnerships cite paragraph ten of Linda Paine's declaration for this point. (Uviado Docket Entry No. 18–1 at 4 n. 3). The declaration does not support that statement. Paine made similar statements about the 2006 Uviado Amended Operating Agreement, (Uviado Docket Entry No. 15–10), in Khan's deposition. (Uviado Docket Entry No. 15–5, Khan Depo. at 34:12–:24). The parties do not appear to dispute that the 2006 Agreement was ineffective. (Uviado Docket Entry No. 15–1 at 5) (noting that it "appears" Khan attempted to take control of Uviado through amended operating agreements).

Gramercy as the tax matters partner at its Connecticut address. (Uviado Docket Entry No. 1–1, Ex. A; Leman Docket Entry No. 1–1, Ex. A).

Sometime in the latter part of 2008, Khan executed a Limited Liability Company Agreement for SRK Wilshire Investments, LLC. This Agreement recited an August 1, 2008 effective date—before the FPAAs—but gave no date of signature. (Uviado Docket Entry No. 15–13, Ex. 9). The Agreement stated that the principal office of SRK Wilshire Investments LLC was at 1200 Smith Street, Suite 1600, Houston, Texas. Linda Paine, counsel for the plaintiffs in these tax cases, executed a lease for SRK Wilshire Investments for this space on September 22, 2008, almost six weeks after the Agreement's effective date. (Uviado Docket Entry No. 16 at 13, citing Smeltzer Decl., Ex. F; Uviado Docket Entry No. 18 at 2, citing Paine Decl. ¶ 1, Ex. 1). The lease term was to begin on October 1, 2008. The plaintiffs assert that this office was to "conduct the litigation and investment management activities of Uviado, Leman and the other entities it managed." (Uviado Docket Entry No. 18–1 at 2). The office is two floors above the offices of counsel for the plaintiffs in these tax cases. The United States asserts that this office was only rarely used and was not the principal office of the partnerships.

The "other entities" SRK Wilshire Investments managed are SRK Wilshire Partners, LLC, Thermosphere FX Partners, LLC, and KPASA, LLC. These three entities were used for investments in 1999, 2000, and 2001. The United States also issued FPAAs to these partnerships. The litigation challenging the FPAAs for these partnerships' tax years was filed in the Tax Court at around the same time that the complaints were filed in Texas for Uviado and Leman. SRK Wilshire Part-

ners and Thermosphere FX Partners filed suit on December 11, 2008, and KPASA, LLC filed suit on January 23, 2009. (Uviado Docket. Entry No. 15–4, Decl. of Gerald A. Thorpe ¶¶ 2–6). Khan filed the suit on behalf of KPASA, as a partner other than the tax matters partner, and SRK Wilshire Investments filed the suit as the tax matters partner in the other two cases. (Id. ¶ 6).

Under amended operating agreements signed May 13, 2009 but with a stated effective date of December 31, 2008, SRK Wilshire Investments, LLC became the "Sole Manager" of Uviado and Leman as well as the other three partnership entities. (Uviado Docket Entry No. 15–12, Ex. 8 at 3, 24, 25; Uviado Docket Entry No. 17–1, Ex. 12 at 3, 23, 24). In a document dated October 27, 2008 but effective October 8, 2003, Khan assigned SRK Wilshire Investments to what he testified in his deposition was a grantor trust, the "Shahid Rafiq Khan Living Trust Created U/T/A/ July 14, 1998." (Uviado Docket Entry No. 15–8, Ex. 2). The United States asserts that through SRK Wilshire Investments, by 2008, Khan controlled Uviado. The plaintiffs do not dispute Khan's ownership of Uviado but do assert that SRK has other officers who "participate in meetings and are active in the management of the partnerships." (Uviado Docket Entry No. 18–1 at 20).

On September 26, 2008, Khan signed a "Consent Action" by which SRK Wilshire Investments, Uviado, and Leman appointed Khan as president, Thomas Clarkson as treasurer, and Timothy Graham as secretary of SRK Wilshire Investments. As noted, Khan lives and works in Champaign–Urbana, Illinois. Clarkson is the Chief Financial Officer of Khan's company, FNG, and is also in Champaign–Urbana, Illinois. Graham is identified as Khan's "in house legal counsel"; he is in Windsor,

Canada. It is unclear where this document was signed.

In October 2008, SRK Wilshire Investments opened a Houston bank account. The primary purpose was to finance this tax litigation. The account was funded in October 2008. The record evidence shows that the money in this account is generally wire-transferred from FNG in Illinois and is largely to pay the Houston attorneys for their work in these cases. (Uviado Docket Entry No. 15–6, Biggers Depo. at 60–63).

On November 14, 2008, SRK Wilshire Investments hired a Houston accountant, Gary R. Biggers, to work on partnership matters. The plaintiffs characterize Biggers's role as the "litigation and financial consultant for the partnerships." (Uviado Docket Entry No. 18–1 at 3; Uviado Docket Entry No. 18–3, Paine Decl., ¶ 5, Ex. 5). Biggers sent his signed copy of the engagement letter to SRK Wilshire Investments at an Urbana, Illinois address on November 14, 2008. (Uviado Docket Entry No. 18–7, Ex. 4). The letter stated that Biggers would provide assistance to SRK Wilshire Investments at the Houston office by collecting and sorting mail twice a week; forwarding the originals to SRK Wilshire and a copy to the partnerships' Houston lawyers; and maintaining copies of correspondence received. (*Id.*). Biggers would also retrieve phone messages and convey them to SRK Wilshire or the Houston lawyers and maintain a Houston bank account to pay vendor bills and a general ledger detailing receipts and disbursements. (*Id.* at 2–3). The letter stated that Biggers would not prepare financial statements or federal income tax returns. (*Id.* at 4).

The United States relies on Biggers's deposition testimony to support its argument that he played a minor role and had some administrative but no substantive responsibilities. Biggers or a staff person was to check the mail and telephone messages received at the Houston office for SRK Wilshire Investments, Uviado, and Leman. Biggers testified that there was very little mail and he could recall no phone messages. Biggers was to maintain a ledger of the receipts and disbursements for Uviado and Leman, which he did on a computer at his own firm. He paid the rent on the leased space. After April 2009, he received investment brokerage statements for Uviado. He did not receive any statements for Leman in Houston; they were apparently sent to Urbana, Illinois. Biggers also sent "summaries" of cash receipts and disbursements to Clarkson, FNG's CFO, in Illinois. Biggers testified that although after April 2009, he reviewed some of the investment account statements after Khan had reviewed them, Biggers did not make investment decisions; those were made by Khan. According to Khan, Biggers reviewed account statements to confirm that the accounts were "accurately reported." (Uviado Docket Entry No. 15–5, Khan Depo. at 52:11). The United States points out that Biggers testified that he spent about fifteen minutes reviewing the statements. (Uviado Docket Entry No. 15–6, Biggers Depo. at 70:5–:19). Because the statements comprise almost 200 pages and reflect a total value of nearly $34 million, a fifteen-minute review "for accuracy" is impossible. The United States points out that by the end of April 2009, Biggers had billed SRK Investments, Uviado, Leman, and the three other entities a total of $4,957.12. (Uviado Docket Entry No. 16 at 16; Uviado Docket Entry No. 15–6, Biggers Depo. at 68). By the end of May 2009, Biggers had billed a total of approximately $10,000. (*Id.* at 75:21–:25). The United States argues that both figures are consistent with the very limited role Biggers—the only person working for the partnerships in Houston—played.

Deposition testimony showed that Biggers would write checks on the SRK Wilshire Investments bank account to pay some of the attorneys' fees in these tax cases. (*Id.* at 56:19–57:2). The money would be wire-transferred from FNG in Illinois. Biggers paid "approved" invoices for legal fees. He did not approve them. Although it was unclear from his deposition testimony who had authority to approve the invoices, they were "probably" forwarded from Clarkson in Illinois. (*Id.* at 50:2–:11, 64:8–:22; 65:14–:20). The evidence showed that on occasion, Clarkson also sent invoices to Houston from Illinois counsel representing Khan in litigation over the state tax consequences of the same partnership investments at issue here. (*Id.* at 50:2–51:4). Biggers wrote these checks in Houston and mailed them back to Illinois. On occasion, Clarkson wrote checks on the Houston bank account from Illinois, including checks to the Houston attorneys in this case and to an entity that provided expert assistance in the case. (*Id.* at 57, 63–65). The United States argues that opening the accounts in Texas and sending Illinois invoices to Houston for payment and mailing back to Illinois was unnecessary in light of the fact that Clarkson could and did write large checks on the same accounts. The United States argues that this is consistent with efforts to "make the Houston office appear more significant than it really was." (Uviado Docket Entry No. 16 at 18). The plaintiffs respond that Biggers's role was consistent with the purpose of the Houston office to centralize administration and record-keeping, although the funds, many of the invoices, and some of the checks continued to be sent from Illinois. (Uviado Docket Entry No. 18–1 at 11, 17, 22).

On November 26, 2008, SRK Wilshire Investments and Uviado were registered to do business in Texas as foreign limited liability companies with a registered agent in Texas. (Uviado Docket Entry Nos. 18–9, 18–10, Exs. 6, 7). On December 5, 2008, Leman was registered to do business in Texas as a foreign limited liability company with a registered agent in Texas. (Uviado Docket Entry No. 18–11, Ex. 8). On the same date, Biggers was appointed an officer in SRK, Uviado, and Leman. (Uviado Docket Entry No. 18–8, Ex. 5).[6]

On December 18, 2008, both Uviado and Leman established a bank account in Houston. Biggers opened the accounts. The accounts were funded with an initial deposit of $1,000 from SRK Wilshire Investments, which had its account at the same bank. Three checks were paid through each account—$350 for the filing fee when these complaints were filed, and $61.48 and $278.66 to the business center where leased space was located—and no deposits were made. (Uviado Docket Entry Nos. 15–38, Ex. 27; 15–39, Ex. 28). In December 2008 and January 2009, Biggers signed seven checks related to Uviado and Leman, totaling $5,438.44. Clarkson wrote a check from Illinois during this period to the SRK Wilshire Investments account to pay attorneys' fees. (Docket Entry No. 19 at 9).

On December 18, 2008, a meeting was held in Houston of the board of directors for SRK Wilshire Investments, Uviado, and Leman. Khan, Clarkson, Graham, Biggers, and the partnerships' Houston litigation counsel attended. (Uviado Docket Entry Nos. 18–13, Ex. 10; 18–14, Ex. 11). At or shortly after this meeting, a number

---

**6.** The resolution appointing Biggers an officer in SRK was dated December 5, 2008 and effective on that date. (Uviado Docket Entry No. 18–8, Ex. 5). Khan signed the resolutions appointing Biggers an officer in Leman and Uviado on May 28, 2009, but the documents stated an "effective" date of December 5, 2008. (*Id.*).

of relevant events occurred. The partnerships appointed SRK Wilshire Investments to serve as tax matters partner for Uviado and Leman and the Gramercy entities resigned. (Uviado Docket Entry Nos. 18–15, 18–16, Exs. 12, 13). Although the appointment and resignation documents were executed in Houston for SRK Wilshire Investments on December 18, 2008, and in an unstated location for the Gramercy entities on December 23, 2008, the documents stated August 1, 2008 as the effective date for the appointment and resignation.

Khan signed a letter on behalf of SRK Wilshire Investments engaging the Houston law firm with which he had been working as "local counsel on behalf of the partnerships to coordinate the underlying tax litigation." (Uviado Docket Entry No. 18–1 at 5; Uviado Docket Entry No. at 18–3, Paine Decl. ¶ 13; Uviado Docket Entry No. 18–25, Ex. 16). The letter was addressed to Khan in Illinois. The letter refers to Khan's "support team," which the United States points out Khan identified as Clarkson and Graham, but not Biggers. (Uviado Docket Entry No. 18–25, Ex. 16).

At the December 18, meeting, it was also decided to redeem some Gramercy-controlled entities from the partnerships. (Uviado Docket Entry No. 18–13, Ex. 10 at 2; Uviado Docket Entry No. 18–14, Ex. 11 at 2). Counsel was instructed to prepare the necessary documents.

On December 23, 2008, Khan signed amended operating agreements for Uviado and Leman changing the identification of the location of the principal office to 1200 Smith Street, Suite 1600, Houston, Texas. The effective date was August 1, 2008. (Uviado Docket Entry No. 15–11, Ex. 7 at 4; Uviado Docket Entry No. 15–15, Ex. 11 at 4).

On December 30, 2008, Biggers executed separate "Virtual Office Agreements" for Leman and Uviado in the same location where SRK Wilshire Investments leased space. Each lease was $225 a month, plus $25 for "call patching" and $25 per month for a listing in the lobby. (Uviado Docket Entry Nos. 18–26, 18–27, Exs. 17, 18). Although Biggers made these arrangements, he did not know what "call patching" meant. Biggers testified that although mail is delivered at that office, that rarely occurs except for mail that was first sent to Khan or Clarkson and forwarded by them from Urbana, Illinois. (Uviado Docket Entry No. 15–6, Biggers Depo. at 15:3–:16). Biggers testified that "very little" mail came to the Houston office that he had to forward to Urbana, Illinois or to Khan's lawyers and that he could not recall any "pertinent" mail. (*Id.* at 15:15–:16; 16:2–:17). Biggers could not recall any telephone messages that were left for the partnerships. (*Id.* at 17:7–:12). Although the partnerships were listed in the lobby, there were no visitors other than for the prearranged meetings described below.

Biggers also testified that the offices contained an incomplete set of documents for the partnerships, including some minute books and old tax returns. (*Id.* at 37:1–:10, 39:2–:15). The partnerships responded that they are in the process of gathering a complete set of the historical documents to place in the Houston office as a centralized location. (Uviado Docket Entry No. 18–1 at 14).

Biggers testified that he visited the leased space once a week for "maybe" fifteen minutes to one hour. (Uviado Docket Entry No. 15–6, Biggers Depo. at 37:20–:23). There is no permanent staff at the office. Before the complaints in these cases were filed in January 2009, the office was used for one meeting, on December 18.

On December 30, 2008, Biggers purchased a laptop for SRK Wilshire Investments. (*Id.* at 47:15–48:2; Uviado Docket Entry No. 18–28, Ex. 19).

### 5. 2009

On January 1, 2009, Biggers "rendered" the laptop and related equipment to Harris County as personal property for tax purposes. The United States points out that the taxable amount for the laptop for each of the six entities was approximately $5.00. (Uviado Docket Entry No. 16–1 at 15; Docket Entry No. 15–6, Biggers Depo. at 49). The parties dispute the extent to which the laptop was used. The plaintiffs assert that the laptop was a "[c]omputer system on which a database of litigation and other records for the partnerships is maintained in the offices of the common managing member," SRK Wilshire Investments. (Uviado Docket Entry No. 18–1 at 5; Paine Decl. ¶ 15, Ex. 19). The United States points out that Biggers testified that he only opened the laptop every other time he visited the leased office space, approximately once every two weeks. (Uviado Docket Entry No. 16–1 at 15; Uviado Docket Entry No. 15–6, Biggers Depo. at 47, 49). Biggers could not recall any specific examples of the laptop being used. (Uviado Docket Entry No. 15–6, Biggers Depo. at 47, 49). Biggers used his own office and its computer for work relating to the partnerships. (*Id.* at 18:5–:10).

On January 8, 2009, Uviado filed the complaint in this suit, by and through Khan, a partner other than the tax matters partner, to challenge the FPAA under 26 U.S.C. § 6226. The complaint alleged that Uviado is "a Delaware limited liability company whose principal place of business is 1200 Smith, Suite 1600, Houston, Texas 77002." (Uviado Docket Entry No. 1 at 2). The complaint alleged that another Delaware limited liability company, SRK Wilshire Investments, LLC, is the managing member and tax matters partner of Uviado and has its principal place of business at the same address listed for Uviado. (*Id.*). The complaint alleged that venue is proper in the Southern District of Texas because Uviado's principal place of business is in Harris County, Texas. (*Id.*).

On January 12, 2009, Leman filed its complaint challenging the IRS's FPAA for the 2003 tax year. (Leman Docket Entry No. 1). The complaint also alleged that Leman is "a Delaware limited liability company whose principal place of business is 1200 Smith Street, Suite 1600, Houston, Texas 7702." (*Id.* at 2). The complaint stated that Leman had two partners in 2003, Jonction, LLC and Gramercy Asset Management, LLC, an affiliate of Gramercy Advisors. (*Id.* at 3). The complaint stated that Jonction was formed in 2003 by Gramercy Advisors as an LLC under Delaware law with two initial partners. (*Id.*). Khan acquired a majority interest in Jonction in 2003. (*Id.* at 4). The complaint alleged that venue is proper in the Southern District of Texas because Leman's principal place of business is in Harris County, Texas. (*Id.* at 2).

### 6. Post-filing Events

The parties agree that events after the complaints were filed cannot establish venue. The plaintiffs urge the court to look at post-filing events to "confirm" that the principal place of business of Uviado and Leman on the filing dates was Houston, and continues to be Houston. (Docket Entry No. 18–1 at 5). The plaintiffs emphasize that there were meetings in Houston on February 18, April 9, May 13, May 28, July 7, and August 13, 2009. The plaintiffs state that all these meetings included discussing and making decisions about the tax litigation. There was also discussion about investments. Two of the meetings—February 18 and April 9—also included redeeming the Gramercy inter-

ests in the partnerships. One meeting, held on May 13, was to complete the redemption process and sign the documents. The plaintiffs state that three meetings—April 9, May 13, and May 28—were to interview prospective investment advisors to reinvest the Gramercy funds and other funds into other investment accounts. The May 13 and May 28 meetings included discussions about whether to "direct funds into new regional investments." (Docket Entry No. 18–1 at 6–7; Paine Decl. ¶¶ 19, 20, Exs. 25–28). On May 28, new account opening documents were signed on behalf of the partnerships in Houston. (Docket Entry No. 18–1 at 7; Paine Decl. ¶ 23, Exs. 33, 34). On August 13, the meeting included a presentation of real estate investment opportunities in Houston. (Id., Paine Decl. ¶ 22, Exs. 31, 32).

The United States responds that under the applicable law, post-filing events are irrelevant to venue. The United States also argues that even if these events are considered for the limited purpose of "confirming" venue that is established by pre-filing events, the record as to post-filing events is consistent with an Illinois principal place of business for the partnerships. The United States points out that Khan did not attend the February 18 meeting. He did attend the meetings on April 9, May 13, and May 28 (which was the day before the scheduling conference before the court in these cases). Biggers testified that he only attended one meeting in 2008 other than his interview, and only some of the partnerships' meetings in 2009, which the United States asserts is consistent with the very limited role he played in the partnerships. (Docket Entry No. 15–6, Biggers Depo. at 33–35). The United States notes that despite statements that these meetings included discussions of new investments, the undisputed evidence is that as of the date of Khan's deposition in July 2009, there were no new investments

made or planned by either partnership. Khan testified in his deposition that any partnership investments that might be made "will [be] in the future." (Uviado Docket Entry No. 16–1 at 19; Uviado Docket Entry No. 15–5, Khan Depo. at 82–83). Khan testified that any investment decisions were his to make. (Uviado Docket Entry No. 15–5, Khan Depo. at 78). Biggers had no role in the partnership investment decisions. (Uviado Docket Entry No. 15–6, Biggers Depo. at 28).

The plaintiffs cite the new accounts for Uviado and Leman opened in May 2009 and funded in June 2009 with $750,000. (Uviado Docket Entry No. 18–1 at 7, Paine Decl. ¶ 23, Ex. 35). The United States points out that as of July 2009, no expenditures had been made from those accounts. (Uviado Docket Entry No. 16–1 at 19). The plaintiffs' subsequent filings do not show any expenditures. The record is also clear that as of Khan's July 2009 deposition, there were no investment or business activities for the partnerships in 2008 or 2009 except the opening of these new accounts. The plaintiffs attached minutes for a board meeting on July 7, 2009 (the day before Khan's deposition), when they had a "discussion of new investment accounts," (Uviado Docket Entry No. 18–38, Ex. 29), and a "discussion of investments," (Uviado Docket Entry No. 18–39, Ex. 30), and a board meeting on August 13, 2009, during which someone came in to give a presentation on real estate investment opportunities "in the Houston area," (Uviado Docket Entry Nos. 18–40, 18–41, Exs. 31, 32). No investments are shown in the record.

In March 2010, the United States sought and was granted leave to supplement the record. (Uviado Docket Entry Nos. 25, 26). The United States asserted that it learned shortly before seeking supplementation that Khan and his wife, Uviado,

Leman, and "certain other related parties" had filed two suits in Champaign County, Illinois in July 2009 against a number of defendants, including Gramercy Advisors, LLC and the accounting firm Khan used in connection with Uviado and Leman and the other tax partnerships. (Uviado Docket Entry No. 25 at 2). The lawyers filing these complaints were in Dallas. The United States argued that "[i]t seems only reasonable that something more than a brief meeting with [the lawyer responsible for the litigation] on April 9, 2009 must have occurred before the two massive complaints were filed in Illinois on July 6, 2009." (*Id.* at 5–6). The United States reiterated its argument that facts arising after these adjustment suits were filed in this court are not relevant to determining the partnerships' primary place of business. The United States asserted that it included the subsequent state court suit because the plaintiffs relied on post-suit events to "confirm" the change in the partnerships' principal place in business. (*Id.* at 3).

The plaintiffs responded with a motion to clarify and correct the record. (Uviado Docket Entry No. 27). The United States responded, (Uviado Docket Entry No. 28), and the plaintiffs replied, (Uviado Docket Entry No. 29). The plaintiffs noted that Uviado and Leman—along with Khan and his wife—are plaintiffs in one of those cases; in the other case, Khan, his wife, SRK Wilshire Investments, and Khan's other tax-related partnerships, but not Uviado and Leman, are plaintiffs. (Uviado Docket Entry No. 27 at 2–3). The plaintiffs argued that the state-court complaint they filed in Illinois identified Houston as

their primary place of business. (*Id.* at 2). The plaintiffs pointed out that the state court suits were filed six months after this federal case, and that the venue in the civil state suit was based on years of events in Illinois. (*Id.*). The United States responds that these events are the same events at issue in the tax litigation filed in Houston, Texas. (Docket Entry No. 28 at 1).

The United States emphasizes Khan's role as the decisionmaker for the partnerships. The only others are the two members of his "team," Clarkson (the CFO in Illinois) and Graham (the in-house counsel in Canada). The United States also emphasizes that when Khan sought to establish Houston as the principal place of business for SRK Wilshire Investments, Uviado, and Leman, he did not seek to move the principal place of business of three other entities—SRK Wilshire Partners, LLC, Thermosphere FX Partners, LLC, and KPASA, LLC. These three entities were used for investments in 1999, 2000, and 2001. The United States issued FPAAs as to these entities, and the litigation challenging the FPAAs for these tax years was filed in the Tax Court at around the same that the complaints were filed in Texas for Uviado and Leman. (Docket Entry No. 15–4, Thorpe Decl. ¶¶ 2–6). The United States emphasizes that Khan sought to move only his tax-related investment entities to Houston.

## II. Analysis

When a defendant challenges venue, the burden of proof is on the plaintiff to establish that venue is proper in the district.[7] *Ranger Steel Servs., L.P. v. Or-*

---

7. The Fifth Circuit has not addressed which party has the burden of proof when a party seeks transfer under § 1406(a). In the context of motions to dismiss for improper venue under Rule 12(b)(3), district courts in the

Fifth Circuit have been inconsistent in allocating the burden of proof. *See, e.g., Inst. for Creation Research Graduate Sch. v. Paredes,* No. 3:09–CV–0693–B, 2009 WL 4333366, at *2 (N.D.Tex. Dec. 1, 2009) (collecting cases);

*leans Materials & Equip. Co.*, No. H–09–3111, 2010 WL 173543, at \*1 (S.D.Tex. Jan. 14, 2010). The plaintiff can meet this burden by establishing facts that, taken as true, establish venue. *See McCaskey v. Cont'l Airlines, Inc.*, 133 F.Supp.2d 514, 523 (S.D.Tex.2001). In determining whether venue is appropriate, the court can consider extrinsic facts. *See MaxEn Capital, LLC v. Sutherland,* No. H–08–3590, 2009 WL 936895, at \*3 (S.D.Tex. Apr. 3, 2009).

■ Both parties rely on *Peat Oil & Gas Associates v. Commissioner,* 65 T.C.M. (CCH) 2259, 1993 WL 95592 (1993), because it analyzed the principal place of business for a partnership that managed tax-related investments. *Peat Oil* involved 26 U.S.C. § 7482, which controls venue for appeal of a Tax Court decision. Section 7482(b)(1) provides that a decision "may be reviewed by the United States court of appeals for the circuit in which is located . . . in the case of a petition under section 6226, 6228(a), 6247, or 6252, the principal place of business of the partnership." The case involved several limited partnerships in the business of "managing assets," including interests in oil and gas wells in Ohio and the development of a synthetic fuel. 65 T.C.M. (CCH) 2259, 1993 WL 95592, at \*12. The partnerships filed multiple challenges to the FPAAs issued by the IRS. *Id.* at \*1. In most of the petitions, the partnerships alleged a principal place of business in Plainview, New York. But in some, the partnerships alleged a principal place of business in Ohio. *Id.* The court was asked to determine whether Ohio was the partnerships' principal place of business when the suits were filed. *Id.*

A condensed version of the relevant facts begins with a Connecticut address listed in the certificates of limited partnership for the office and agent for service of process, and in the agreement of limited partnership for each of the partnerships' "principal office and place of business." *Id.* at \*2. A New York address was listed in the certificates of limited partnership as the location of the general partner; in the private placement memorandum for the partnerships' "principal executive office"; in the partnerships' various agreements relating to research, management, licensing, and drilling; and in the closing documents provided to investors. *Id.* at \*2–3. The limited partnership agreement for each of the three partnerships permitted the general partner to determine another location for the principal office and principal place of business but required the general partner to notify the limited partners of a change in principal office or place of business and of any additional offices. *Id.* at \*2. The partnerships maintained bank accounts at New York branches. *Id.* at \*3. The partnerships interviewed their manager in New York. *Id.* at \*4. The partnerships' main management contract was executed in New York. *Id.* The manager kept a New York office. The manager traveled

*Ashton v. Knight Transp., Inc.*, No. 3:09–CV–0759–B, 2009 WL 2407829, at \*1 & n. 3 (N.D.Tex. Aug. 6, 2009) (same). The "overwhelming weight of authority" allocates the burden to the plaintiff to establish that venue is proper once the defendant challenges venue. *Paredes,* No. 3:09–CV–0693–B, 2009 WL 4333366 at \*2; *see also* 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1352 (3d ed.2004) (noting that although a number of federal courts have held that the burden to defeat venue is on the defendant in a motion to dismiss under Rule 12(b)(3), "perhaps a larger" number of federal courts have imposed the burden on the plaintiff, and asserting that placing the burden on the plaintiff "seems correct" because the plaintiff has the obligation to choose a permissible forum for jurisdiction and venue); 14D CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3826 (3d ed.2007) (placing the burden on the plaintiff once an objection has been raised is the "better view").

to Ohio twice a year on partnership business but did not maintain an office there. *Id.* Partnership records were kept in New York, New Jersey, and Pennsylvania. *Id.* State tax returns were filed in New York and listed a New York address. *Id.* Federal income tax returns showed New York or New Jersey addresses. *Id.* The partnerships filed Ohio nonresident state income tax returns for a portion of the relevant tax years, listing New York or New Jersey addresses. *Id.*

The partnerships had a nonownership interest in a reactor in North Carolina and owned a piece of raw land in Missouri. *Id.* The partnerships also owned working interests in various oil and gas wells in Ohio. Substantially all the partnerships' income for some of the tax years was from these wells in Ohio. *Id.* The partnerships owned substantial oil and gas well-drilling equipment in Ohio. The certificates of ownership and notices of sale for the Ohio oil and gas interests listed New York addresses. *Id.* at *5. Oil and gas revenues were paid to a bank in Ohio. *Id.* None of these address listings were changed or amended. The general partner did not notify the other partners of a change in the principal office. *Id.* at *6.

Some partnership records were transferred to California during tax-related litigation involving the individual limited partners. *Id.* at *5. From that litigation, the two limited partners' cases were separately appealed to the Sixth and Eleventh Circuits. The limited partners received a favorable outcome in the Sixth Circuit and an unfavorable outcome in the Eleventh Circuit. *Id.* In several of the suits challenging the final partnership administrative adjustments that were filed following the decisions by the Sixth and Eleventh Circuits, the partnerships alleged that their principal place of business was in Ohio, presumably to take advantage of the

then-favorable law in the Sixth Circuit. *Id.* at *6.

In considering the partnerships' principal place of business at the time the suits were filed, the Tax Court observed that "[a]t no time prior to the opinion of the Sixth Circuit did either partnership represent that it had a principal place of business in Ohio or in Tennessee" and that "[n]o formal notice was given to the limited partners of any change in the principal place of business of the partnerships." *Id.* The court noted that the partnerships had no employees but were instead managed by contract and that the manager resided and maintained an office in New York. *Id.* The court concluded that the principal place of business at the time the suits were filed was at the manager's office in New York. *Id.*

The Tax Court observed that during the tax years at issue, there were minimal partnership activities. Indeed, it was arguable that the partnerships lacked a principal place of business at all. *Id.* In formulating a standard to evaluate a partnership's "principal place of business," the court first discussed *Commissioner v. Soliman,* 506 U.S. 168, 113 S.Ct. 701, 121 L.Ed.2d 634 (1993). In *Soliman,* the Supreme Court considered whether a taxpayer's home office qualified as his "principal place of business" under 26 U.S.C. § 280A(C)(1)(A). The Court first considered the "ordinary, everyday senses" of the words. *Soliman,* 506 U.S. at 174, 113 S.Ct. 701 (citation omitted). The Court determined that "principal" suggested that a comparison of locations of the taxpayer's business was necessary. *Id.* The court concluded that no test for determining a taxpayer's principal place of business would provide a clear answer in every case. Instead, it was a subtle inquiry, "with the ultimate determination of the principal place of business being depen-

dent upon the particular facts of each case." *Id.* at 175, 113 S.Ct. 701. In the context of an individual taxpayer, the Court looked to the "relative importance of the activities performed at each business location and the time spent at each place." *Id.*

After discussing *Commissioner v. Soliman,* the *Peat Oil* court evaluated standards applied in the diversity jurisdiction and bankruptcy contexts, which then included several different formulations. 65 T.C.M. (CCH) 2259, 1993 WL 95592, at *9. After discussing the legislative history of the provision at issue in *Peat Oil,* the Tax Court concluded that "the most [it could] conclude from th[e] legislative history regarding corporations is that Congress believed that the phrase 'principal place of business' had become a term of art through use in the Bankruptcy Act and other Federal statutes." *Id.* at *11. The *Peat Oil* court observed that the common theme was a requirement that all relevant facts and circumstances be considered and that the focus be on "the relative importance of the functions performed at each business location, [which] depends 'upon an objective description of the business in question . . . so that the decisionmaker can evaluate the activities conducted at the various business locations in light of the particular characteristics of the specific business or trade at issue.'" *Id.* (ellipsis in original) (quoting *Soliman,* 506 U.S. 168, 113 S.Ct. 701).

The court concluded that the partnerships could not specify a particular location in Ohio that was the partnerships' principal place of business, noting that no partnership employees were engaged in drilling operations and that although payments went to a bank in Ohio, no one contended the bank was the primary place of business. No partners spent significant time in Ohio on partnership affairs. *Id.* at *12.

The court noted that the administrator hired by the managing partner to make the business decisions about the partnerships had his office in New York. *Id.* at *13. That was also the location where the communications with the partnerships occurred. In applying the standard, the court concluded that "[i]n cases involving [ ] investment partnerships, the principal place of business is not where the property is located but where decisions are made." *Id.* at *12. The court also noted that "[i]t is difficult to conceptualize a principal place of business that is not the place where the partnerships maintained contact with the outside world." *Id.* at *13 (citing *Soliman,* 506 U.S. 168, 113 S.Ct. 701). The court held that at the time the suits were filed, the partnerships' principal place of business was in New York. *Id.* at *4.

■ Beyond *Peat Oil,* there is little case law or any other authority to offer guidance for the interpretation of "principal place of business" as that term is used in § 6226. Generally, when a federal statute contains an undefined term, it is presumed that, absent evidence to the contrary, "Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'" *Matter of England,* 153 F.3d 232, 235 (5th Cir.1998); *see United States v. 525 Co.,* 342 F.2d 759, 761 (5th Cir.1965) ("Congress intended the words to have their natural, ordinary and familiar meaning."); *see also McDermott Int'l, Inc. v. Wilander,* 498 U.S. 337, 342, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991) ("Moreover, 'seaman' is a maritime term of art. In the absence of contrary indication, we assume that when a statute uses such a term, Congress intended it to have its established meaning."). While there may be sparse authority specifically addressing § 6226, there is a large body of law interpreting "principal place of business" in

another context: the determination of a corporation's citizenship for the purposes of diversity jurisdiction. *See* 28 U.S.C. § 1332(c)(1). The *Peat Oil* court concluded it was appropriate to consider cases in that context when that case was decided in 1993. The impact of these cases on the standard under § 6226 must be reconsidered in light of the significant amount of case law in the past seventeen years, particularly the Supreme Court's recent opinion in *Hertz Corp. v. Friend,* —— U.S. ——, 130 S.Ct. 1181, 175 L.Ed.2d 1029 (2010).

Section 6226 was enacted as part of the Tax Treatment of Partnership Items Act of 1982, Pub.L. No. 97–248, § 6226, 96 Stat. 324 (1982). By that time, "principal place of business" had been in use in the diversity jurisdiction context for nearly twenty-five years and for many years before under the Bankruptcy Act. *See generally Hertz Corp.,* 130 S.Ct. at 1188–90 (tracing the legislative history of the 1958 amendments to 28 U.S.C. § 1332). As the Supreme Court recently explained *Hertz,* the determination of a corporation's "principal place of business" for diversity purposes proved challenging, and the circuits established divergent approaches to the determination in the fifty years following the amendments. *See generally id.* at 1190–92 (tracing the interpretation of § 1332(c)(1)). In *Hertz,* the Supreme Court adopted the "nerve center" test, which states that a corporation's principal place of business is "where a corporation's officers direct, control, and coordinate the corporation's activities[,] ... in practice it should normally be the place where the corporation maintains its headquarters— provided that the headquarters is the actual center of direction, control, and coordination, *i.e.,* the 'nerve center,' and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have

traveled there for the occasion)." *Id.* at 1192.

In adopting the "nerve center" test, the Court addressed three sets of considerations. First, the Court examined the plain language and concluded that "[t]he word 'place' is in the singular, not the plural" and that "[t]he word 'principal' requires us to pick out the 'main, prominent' or 'leading' place." *Id.* (quoting 12 OXFORD ENGLISH DICTIONARY 495 (2d ed.1989) (def. (A)(I)(2))). The court held that "place" meant a single place within a state, not a state itself, and that the corporation's "nerve center" is a single place, usually regarded by the public as the corporation's main place of business. *Id.* at 1193. Second, the Court concluded that the "nerve center" test furthered comparative administrative simplicity. *Id.* Third, the Court concluded that the statute's legislative history supported applying a comparatively simpler standard because Congress had rejected a numerical test, such as "half of gross income," as too complex and impractical to apply. *Id.* at 1194. The Court acknowledged that even under the nerve-center test, there would remain "hard" cases, due in part to technological innovations that increasingly permit corporations to divide command and coordination over many locations. *Id.*

As the court recognized in *Peat Oil,* and as the parties recognize here, it is difficult to apply a "principal place of business" test to an investment partnership that at the relevant time has no employees and no significant activities other than litigation to defend the tax consequences of prior investments. In addition, the record shows the kind of activity that the *Hertz* Court identified as presenting a "hard" case— one in which telecommunications permit those involved in the business to "divide their command and coordinating functions among officers who work at several differ-

ent locations, perhaps communicating over the Internet." 130 S.Ct. at 1194. In such a case, the Supreme Court requires an examination of "the center of overall direction, control, and coordination." *Id.*

Before filing suit, the partnerships leased physical space in Houston and retained Biggers, a CPA. Such steps are consistent with what the *Peat Oil* court relied on in finding that New York was the partnerships' principal place of business. In this case, however, unlike *Peat Oil,* the individual retained by the managing partner played a very limited role. Biggers had no decisionmaking role in the conduct of the litigation that was the partnerships' primary business when the complaints were filed. Biggers had no decisionmaking role in any other substantive aspect of the partnerships' activities either before or after the lawsuits were filed. He did not decide whether to open the bank accounts or how much to deposit or withdraw. He did not have any involvement in any investment decision and had no authority over investments at all. The evidence is that the office space the partnerships leased was used rarely. Biggers himself visited approximately once a week, for between fifteen minutes to an hour. His work was so limited that he had billed less than $5,000 for work on six separate entities—including SRK Wilshire Investment, Uviado, and Leman—between November 2008, when he was retained, and the end of April 2009.

There were occasional meetings when Khan or other members of his "team" visited Houston. *Hertz* instructs the court to determine "where a corporation's officers direct; control, and coordinate the corporation's activities." 130 S.Ct. at 1192. The Court observed that "in practice it should normally be the place where the corporation maintains its headquarters." *Id.* The Court stated that the headquarters

will normally be the principal place of business, "provided that the headquarters is the *actual* center of direction, control, and coordination, *i.e.,* the 'nerve center,' and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion)." *Id.* (emphasis added). In this case, the leased space was used for such meetings and very little else.

In *Peat Oil,* one factor the court emphasized was where the partnership received communications. In the present case, the partnerships executed "virtual leases," an address, a listing in the building lobby, and a telephone number. But Biggers testified that virtually the only mail received was forwarded from FNG in Illinois. No one looked for the partnerships in the lobby. No one called; Biggers could not remember a single telephone message. (Docket Entry No. 15–6, Biggers Depo. at 15:15–:16; 16:2–:17; 17:7–:11; 45:4–:10). The leased office is more similar to a "drop box" than the nerve center of an investment partnership.

The United States argues that the "very significant" decision in 2008 to move the partnerships to Houston was not made in Houston. (Docket Entry No. 19 at 6). But, as the United States seems to acknowledge, this decision could not have been made in Houston because the partnerships did not yet have a presence there. (*Id.*). The record shows that even after the partnerships executed a "virtual lease" in Houston, hired a CPA in Houston, moved some records to Houston, and had some meetings in Houston, the place where the decisions to direct, control, and coordinate the partnerships's business—how to conduct the litigation, manage prior investments, and decide whether to make new investments—continued to be with Khan in Champaign–Urbana, Illinois. The

record shows that Houston may have been the location of certain administrative functions, such as gathering historical documents and filing tax returns. But the "nerve center" continued to be where Khan and his team made the substantive decisions about the partnerships' business—the litigation and any investments that might be made.

In the fall of 2008, SRK signed a "Consent Action" appointing Khan and two others—both part of Khan's team, one in Champaign, Illinois and one in Windsor, Canada—officers of SRK Wilshire Investments, and the paperwork was delivered to the partnerships' Houston counsel. (*Id.*). SRK Wilshire Investments opened and funded a bank account in Houston to finance this litigation. The engagement letter hiring the accountant, Biggers, was sent to Illinois to be executed by Khan. (*Id.* at 7). Khan signed documents making Biggers an officer of SRK before the trip to Houston in December 2008. (*Id.* at 7–8). Houston counsel sent Khan the litigation engagement letter in Illinois on December 18, 2008. (Docket Entry No. 21 at 2). Over this same period, checks were paid from the Houston account using money wire-transferred from Illinois, and some checks were written on this account from Illinois. Khan received and reviewed investment statements and litigation documents in Illinois. (*Id.* at 3–4).

The record shows that Khan controlled both Uviado and Leman directly or through entities he owned. Khan "called all of the shots for all of the entities." (Uviado Docket Entry No. 16–2 at 22). The partnerships do not dispute that Khan controlled them. While the partnerships are legally distinct from Khan, their control is not. The inquiry in *Hertz* concentrates on the center of direction and control, minimizing the importance of administrative activities and the occasional

meeting attended by directors and officers who travel there for the occasion. In this case, when the complaints were filed in January 2008, Khan had visited Houston once, for the December 18 meeting. Khan signed the engagement letter for Houston counsel, the engagement letter for Biggers, and other critical documents in Illinois. The fact that litigation counsel was in Houston does not mean that the partnerships' principal place of business was in Houston. Khan made the substantive decisions on the litigation on behalf of the partnerships. When the suits were filed, the partnerships had not moved the center of direction, coordination, and control to Houston. Events occurring after the filing of the suits, including several meetings in the Houston office, do not dictate a different result. Houston provided little more than "an office where the [partnership] holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion)." *See Hertz,* 130 S.Ct. at 1192.

The plaintiffs argue that the United States "fails to identify any other place which could conceivably qualify as the partnerships' principal place of business." (Docket Entry No. 18–1 at 13 (emphasis omitted)). But the United States points to Champaign–Urbana, Illinois as the principal place of business based on Khan's role and presence there and the activities that were still occurring there in January 2009. It was where the critical documents were sent, even if copies were to be maintained in Houston; where the funds the partnerships used originated; and where both Khan and Clarkson live and work. It was where the decisions on the litigation and other partnership activities continued to be made.

The United States also points to the litigation in the Seventh Circuit and the Eastern District of Michigan related to

IRS summonses: *Khan v. United States,* 548 F.3d 549 (7th Cir.2008), and *Khan v. United States ex rel. IRS,* Nos. 07–50407, 07–50418, 07–50419, 07–50421, 07–50422, 07–50423, 2009 WL 1034796 (E.D.Mich. Apr. 15, 2009). In the Seventh Circuit case, Khan and his wife moved to quash a subpoena issued to a CPA in connection with the investigation and audit of the Khans' tax returns. 548 F.3d at 551. The Khans alleged that 26 U.S.C. § 7602(d)(1) barred the IRS from summoning the CPA as a third-party witness because the IRS would not reveal whether it had referred the CPA to the Department of Justice in connection with his involvement in the Khans' taxes. *Id.* The Seventh Circuit held that § 7602(d)(1) was ambiguous and deferred to the IRS Commissioner's interpretation of the statute, which made § 7602(d)(1) applicable only when the IRS referred the taxpayer whose liabilities were at issue to the Department of Justice, and not to a third party witness when it has referred the summoned third party to the Department of Justice. *Id.* at 557. The court remanded the case to the district court to consider the Khans' remaining challenges to enforcing the summons. *Id.* The appeal to the Seventh Circuit was taken before the issuance of the FPAAs to Uviado and Leman. The opinion does not discuss the location of the partnerships' substantive business activities.

In the Eastern District of Michigan case, the Khans moved to quash an IRS summons of another employee of the accounting firm at issue in the Seventh Circuit case. *Khan,* Nos. 07–50407 *et al.,* 2009 WL 1034796, at *1. Relying on the Seventh Circuit's opinion, the court denied the plaintiffs' motion to quash and granted the United States' motion to enforce the summonses. *Id.* at *6. In explaining the facts, the court noted that the summonses related to five entities: KPASA, LLC, SRK Wilshire Partners, LLC, SRK Wil-

shire Partners, Inc., Jonction, LLC, and Uviado, LLC. *Id.* at *3–4. Citing to the petitions to quash the summonses, the court noted that the principal place of business was "Connecticut 'or' Illinois" for KPASA, Jonction, and Uviado; and Illinois for SRK Wilshire Partners, LLC and SRK Wilshire Partners, Inc. *Id.* The petitions to quash the summonses were filed in 2007, again before the partnerships allege they moved their principal place of business. The case does not assist this court in determining whether the partnerships effectively changed their principal place of business in late 2008.

The parties dispute the relevance of the partnerships' reasons for moving their principal place of business to Houston. The United States argues persuasively that the reasons articulated by the partnerships—primarily the convenience of their counsel—are contradicted by the record, including by the fact that the partnerships and Khan retained Dallas counsel to handle litigation in Illinois. The plaintiffs do not dispute that there is more favorable law on the penalty liability issues in the Fifth Circuit than in the Seventh Circuit, the Tax Court, or the District of Connecticut. While the subjective motivation is not critical, the reasons bear on whether there was an effective change of the principal place of business.

Anytime the law affords more than one venue choice, "forum shopping" in the sense of forum selection is unavoidable. *See* 14D CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3806.1 (3d ed. 2007) ("[O]ne consequence of liberalizing the transactional venue provision is that there is an increased opportunity for plaintiffs to forum shop...."). In the § 6226 context, the *Peat Oil* court discussed "forum shopping" in the more pejorative sense of manipulating the venue choice.

In that case, the court noted that the partnerships' representations that their principal place of business was in New York "were made at times when no forum shopping motivation was apparent, [and were] more reliable as an indication of petitioners' bona fide place of business than subsequent allegations that the principal place of business was in Ohio." 65 T.C.M. (CCH) 2259, 1993 WL 95592, at *14. The court also noted that "[i]n the context of a determination of principal place of business for purposes of deciding venue on appeal ... the parties and the courts should be entitled to rely on the representations of the entity made at a time when forum shopping was not apparent." *Id.* In *Hertz,* the Supreme Court also expressed concern about "forum shopping" in the diversity jurisdiction context, noting that the mere declaration or listing of a place as the corporation's principal place of business did not satisfy the inquiry. The Court observed:

> Such possibilities would readily permit jurisdictional manipulation, thereby subverting a major reason for the insertion of the 'principal place of business' language in the diversity statute. Indeed, if the record reveals attempts at manipulation—for example, that the alleged 'nerve center' is nothing more than a mail drop box, a bare office with a computer, or the location of an annual executive retreat—the courts should instead take as the 'nerve center' the place of actual direction, control, and coordination, in the absence of such manipulation.

130 S.Ct. at 1195. Another court has recently expressed similar concerns. *See In re Zimmer Holdings, Inc.,* 609 F.3d 1378, 1381–82 (Fed.Cir.2010) (disregarding the plaintiff's alleged principal place of business in a transfer of venue analysis under § 1404(a) because the plaintiff's research and development and patent prosecution took place in another forum and the plaintiff's presence in the forum was "recent, ephemeral, and an artifact of litigation" and it was clear the plaintiff was "attempting to game the system by artificially seeking to establish venue by sharing office space with another of the trial counsel's clients").

The Internal Revenue Code permits the partnerships to file in "the district court of the United States for the district in which the partnership's principal place of business is located." 26 U. S.C. § 6226(a). The Treasury Regulations state that this place is to be determined "as of the date the petition is filed." 26 C.F.R. § 301.6226(a)–1. The United States acknowledges that § 301.6226(a)–1(b) permits a partnership to move its principal place of business between the issuance of an FPAA and filing a complaint to challenge the proposed adjustments. (Uviado Docket Entry No. 19 at 1). But the move must be effective. Neither the statute nor the regulations permit the partnerships to move their primary place of business through superficial changes in address, registration, or banking, without also changing the primary place of direction, control, and coordination. The Houston office, as of early January 2009, was little more than "a mail drop box [or] a bare office with a computer." Illinois was the "place of actual direction, control, and coordination, in the absence of ... manipulation" and thus the principal place of business of both Uviado and Leman.

■ As a final note, the United States challenges venue under § 6226 and seeks to transfer venue under 28 U.S.C. § 1406(a). To order a venue transfer under § 1406(a), a court must have subject-matter jurisdiction over the case. *See Andrade v. Chojnacki,* 934 F.Supp. 817, 824 (S.D.Tex.1996); 14D CHARLES ALAN

WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3827 (3d ed.2007). The Fifth Circuit has not decided whether § 6226 is a limit on the district court's subject-matter jurisdiction or a venue provision. The Federal Circuit has explicitly held that the listing of courts in § 6226(a)(2) is a venue, not a jurisdictional, provision. In *Transcapital Leasing Associates., 1990–II, L.P. v. United States,* 398 F.3d 1317 (Fed.Cir.2005), the court noted that § 6226 uses "language generally associated with venue, not jurisdiction" and that another statute, 28 U.S.C. § 1346(e), explicitly provided the district courts with original jurisdiction over "any civil action against the United States provided in section 6226 ... of the Internal Revenue Code." *Id.* at 1320 (ellipsis in original). The court reasoned that because § 1346 provides the court with jurisdiction over the case, § 6226 provides venue. *Id.* at 1320–21; *see also Nev. Partners Fund, LLC ex rel. Sapphire II, Inc. v. United States,* 714 F.Supp.2d 598, 601 (S.D.Miss.2010) ("Under § 6226(a), the United States District Court for the District in which the partnership's principal place of business is located is a proper venue for this lawsuit. The parties do not contest this court's subject matter jurisdiction to hear this dispute."). In contrast, at least one Internal Revenue Service Field Service Advisory has concluded that § 6226 is jurisdictional. I.R.S. Field Serv. Adv. TL–N–1037–93 (1997), 1997 WL 33314344 ("Jurisdiction, rather than venue, is at issue in this case. The Tax Court, the Court of Federal Claims, and the district court for the district in which the partnership's principal place of business is located have concurrent jurisdiction to adjust partnership items.... A district court will not have jurisdiction unless the principal place of business is located in the district in which the petition is filed."). While not considering the issue explicitly,

other cases have indicated that some requirements in § 6226 are jurisdictional. *See RJT Invs. X v. Comm'r,* 491 F.3d 732, 735 (8th Cir.2007) ("TEFRA grants jurisdiction to qualified courts to hear readjustment petitions." (citing 26 U.S.C. § 6226(a), (b))); *PCMG Trading Partners XX, L.P. v. Comm'r,* 131 T.C. 206, 211 (2008) ("As previously stated, section 6226(b)(1) sets forth our jurisdiction over petitions for readjustment of partnership items filed by notice partners and 5–percent groups."); *Imprimis Investors LLC v. United States,* 83 Fed.Cl. 46, 64 (2008) ("IRC § 6226(a) specifies that the only courts with jurisdiction over final partnership administrative adjustments for federal tax returns are the United States Tax Court, the United States District Court in the district in which the partnership's principal place of business is located, or the United States Court of Federal Claims."). Commentators have noted that venue and jurisdiction provisions are at times "not easily distinguished." 14D CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3821 (3d ed.2007). The court need not make that difficult distinction because the court is authorized under 28 U.S.C. § 1631 to cure the jurisdictional problem by transferring the case to a court with jurisdiction. 28 U.S.C. § 1631 ("Whenever a civil action is filed in a court ... and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed....");14D CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3827 (3d ed.2007) ("Section 1631 does allow a court lacking subject matter jurisdiction to cure the jurisdictional problem through transfer.").

The record shows that transfer to the Central District of Illinois is appropriate under § 6226 and in the interests of justice. There are no witnesses identified in Houston. To the extent records are here, they were only moved in an effort to establish venue. The other relevant factors do not support venue in Houston. The motions to transfer venue are granted.

## III. Conclusion

These cases are transferred to the Central District of Illinois, Urbana Division.